**Sarah A. GREEN, Plaintiff,**

v.

**The VERMONT COUNTRY STORE, Defendant.**

No. 1:01–CV–60.

United States District Court, D. Vermont.

March 14, 2002.

Norman E. Watts, Jr., Woodstock, VT, for plaintiff.

Heather Briggs, Gravel & Shea, Burlington, VT, for defendant.

## OPINION AND ORDER

(Paper 24)

MURTHA, Chief Judge.

Defendant The Vermont Country Store ("VCS") moves for summary judgment on Plaintiff Sarah A. Green's claims for wrongful termination, breach of good faith, age discrimination and retaliation. For the reasons set forth below, VCS's motion is GRANTED.[1]

### I. Background

A. *The Outside Audit Recommendations and Green's Termination*

Green was employed by VCS as Training and Development Manager from March 25, 1996 until January 3, 2001. In October of 2000, Gallagher, Flynn & Company ("GFC") conducted an audit of VCS's Human Resources Department for the purpose of "recommend[ing] the proper structure for the Human Resource department as VCS continues to grow." Paper 25, Ex. C. Among other recommendations, the audit concluded that

VCS should not have a separate position for Training and Development. We believe that most of the training that will take place in the organization will be conducted by outside companies. The VP of HR, as part of the Organizational Development function, should be responsible for the development and implementation of the training and development plan for VCS. The incumbent in the Training and Development position today is not seen by the people we interviewed as being effective in this role. The positive feedback she received was by managers who use her as an HR Generalist regarding one-on-one employee issues. Most of the people we interviewed were not sure as to the overall contribution that has been made by the incumbent. Several thought that the programs that have been delivered were not followed through properly. Given this reality, we believe that VCS would be better served by a Manager of Compensation and Benefits than Training and Development. As VCS grows, this position could be added in the future. Typically, you do not see in-house Training and Development managers until the company reaches 750–1000 employees.

---

1. This Opinion does not address Counts IV and V, which state claims for retaliation, since Plaintiff concedes that dismissal of those claims is appropriate.

*Id.* The audit also recommended "establishing a structure whereby every department in the company has a [human resources] representative assigned to it." *Id.* This representative, a so-called "Human Resources Generalist" "would handle virtually all the HR needs for his/her assigned departments[,]" by "develop[ing] a close working relationship with each of the supervisors and managers whom he/she is assigned to[,]" and "knowing the 'pulse' and issues of the non-management employees in his/her assigned areas." *Id.*

During her deposition, Green testified that she lacked qualifications and training needed for the position of Benefits and Compensation Manager. Green also conceded that prior to her dismissal she told her immediate supervisor, Vice–President for Human Resources Pamela Nemlich, that she preferred not to spend a large amount of her time at VCS "dealing with hourly employees," since she "had done that for many years . . . and . . . wanted to move in to the next level." *Id.*, Ex. B, at 102–03.

On January 3, 2001—without prior warning that her job performance was lacking or notice about the recommendations contained in the GFC audit [2]—Green was terminated from her position. When Green questioned why she was being terminated, Nemlich told her that the decision was based on Green's "value" to VCS and the GFC audit recommendation that VCS eliminate Green's position in favor of a benefits and compensation position. Green later testified that her termination was a "direct" result of the GFC audit's criticism of her job performance, as well as the recommendation that the Human Resources Department would operate more

effectively with a Manager of Benefits and Compensation position.

### B. *VCS's Personnel Policies*

The first page of VCS's Employee Handbook contains an isolated paragraph that states: "The Vermont Country Store is an equal opportunity employer. The Vermont Country Store subscribes to an employment at will policy. This handbook establishes guidelines only. It does not constitute a contract in any way, shape, or form." Paper 25, Ex. E. The Handbook elsewhere states: "The Vermont Country Store reserves the right to dismiss an employee with or without cause and with or without notice at any time." *Id.*

With respect to VCS's employee policies, Green testified that: (1) she received and read the Employee Handbook; (2) she was never told the Handbook constituted an employment contract; (3) she understood VCS could terminate its employees "on the spot," but that VCS sometimes chose to give its employees a warning instead; (4) she was never told she could only be fired for just cause or only if she received a prior warning.

### C. *Green's Alleged Replacement*

Green was 52 years of age when she was terminated. Six weeks prior to her termination, VCS hired Kelly Moriarty to be a Human Resources Specialist. Moriarty was 30 years old when she was hired and had no prior experience in the field of human resources. *See* Paper 25, Ex. I. Moriarty testified that she "felt that [she] was hired to do half training and half employee relations." *Id.* As of July 2001, however, Moriarty's job responsibilities, job title, and pay level differed from those

---

**2.** As a member of VCS's Human Resources Department, Green participated in the audit interviews conducted by GFC. The audit was performed for use by upper-level management at VCS, and therefore its findings and recommendations were not disclosed to Green prior to this litigation.

held previously by Green. In particular, Moriarty's job responsibilities primarily encompassed employee relations, including recruitment, orientation and retention. *Id.*

## II. *Discussion*

### A. *Count I: Wrongful Termination/Breach of Contract*

Under Vermont law, there is a presumption that employment for an indefinite period is employment "at will." *See Havill v. Woodstock Soapstone Co.*, 783 A.2d 423, 427 (Vt.2001). "At will" employment relationships are "terminable at any time, by either party, for any reason or for no reason at all." *Trombley v. Southwestern Vt. Med. Ctr.*, 169 Vt. 386, 738 A.2d 103, 108 (1999). "At-will employees are thus barred from bringing wrongful discharge claims." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1242 (2d Cir. 1995) (applying Vermont law).

The presumption of "at will" employment, however, is only a "basic precept of employment contract construction ... [,]" "that can 'be overcome by evidence to the contrary.'" *Taylor v. Nat'l Life Ins. Co.*, 161 Vt. 457, 652 A.2d 466, 470 (1993) (quoting *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 613 A.2d 1277, 1279 (1992)); *see also Havill*, 783 A.2d at 427 (the "at will" presumption is a "rule of construction, and not of substantive law, which the parties can modify according to the usual rules of contract").

"In determining whether the at-will status has been modified, a court may consider a variety of factors, including the personnel policies or practices of the employer, and actions or communications by the employer reflecting assurances of continued employment." *Brace v. Int'l Bus. Machines Corp.*, 953 F.Supp. 561, 567 (D.Vt.1997) (citing *Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 514 A.2d 716, 718 (1986)); *see Havill*, 783 A.2d at 428. Personnel policy manuals may create an enforceable employment contract if they are distribut-

ed to employees and contain " 'definitive policies, which expressly or impliedly include a promise for specific treatment in specific situations....' " *Trombley*, 738 A.2d at 109 (quoting *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 665 A.2d 580, 584 (1995)); *see Havill*, 783 A.2d at 428 ("Personnel policies that commit an employer to a progressive discipline system present a triable issue of fact on whether an employer may terminate an employee only for just cause."); *Ross*, 665 A.2d at 585 ("The critical inquiry is ... whether the procedure amounted to an enforceable promise of specific treatment in a specific circumstance."). Similarly, an employer's practice may create an enforceable employment contract so long as "it is clearly established and uniformly and consistently applied throughout the company." *Ross*, 665 A.2d at 585.

In this case, Green argues she was not an "at-will" employee and that her termination was wrongful because of a "general spirit of fairness contained in the handbook pronouncements and practices pursued by VCS." Paper 25, Ex. B, at 97–98. She maintains that three separate statements in the Handbook create an implied employment contract with VCS: First, Green cites the "President's Welcome" section of the Handbook, which reads in relevant part:

> We pride ourselves on excellent relationships with two groups of people—our employees and our customers.
> \*\*\*
>
> We believe that an employee who is proud of the company, satisfied with his or her job, compensation, benefits, and working conditions, happy with co-workers, and challenged for personal growth, will be most likely to offer exemplary service to our customers. Therefore, in order for our customers to come first, our employees really have to come first.
> \*\*\*

I strongly encourage every person in this organization to never be afraid to care.... Care that the company's future success is yours also. This company values these things and supports individuals whose actions exhibit that kind of attitude. You will always have my support when you conduct yourself this way.

Paper 25, Ex. E.

Second, Green cites the Handbook section entitled "Ambassadors," which states:

This message is from [the VCS President] to every current employee and is intended to help new and prospective employees understand our company.

The comment I hear the most from people outside VCS is, 'What nice people you have working with you.' Each of us is an ambassador and obviously people have noticed and will continue to notice. Just think how good it made you feel when you were first joining VCS to be welcomed and assisted by the people already on the job. And think about what made you decide to join us. Use these personal thoughts in conducting your ambassadorial duties.

*Id.*

Third, Green relies on a "value statement" contained in a 1994 version of the VCS Employee Handbook which states: "Management will assume consistency in planning to maintain our record of no unplanned lay-offs." *Id.*, Ex. H.

Green also contends that certain VCS employee discipline *practices* created an implied employment contract. For example, Nemlich testified that "[i]f an employee wasn't acting as if the ultimate boss was the customer," "[VCS management] would probably sit down and talk about what was going on." Paper 28, Ex. 1, at 44. In addition, when an employee was to be terminated, Nemlich would "at least" review one of that employee's annual job performance appraisals. *Id.* at 41–42.

Viewing the entire record in a light most favorable to Green, no reasonable jury could conclude that an implied employment contract existed between Green and VCS.

First, the Employee Handbook contains only general statements of company policy; there is no definitive and objective promise for a specific course of treatment for specific employee conduct, or for termination only upon just cause. *Compare Ross,* 665 A.2d at 584–86 (no evidence of an enforceable contract exists without proof of specific and progressive disciplinary procedure), *and LeBlanc v. United Parcel Serv., Inc.,* 972 F.Supp. 827, 831 (D.Vt.1997) (no contract can be implied from general handbook statements "stressing fair treatment, cooperation, communication, and delegation of decision-making authority"), *with Farnum v. Brattleboro Retreat, Inc.,* 164 Vt. 488, 671 A.2d 1249, 1253–54 (1995) (jury may determine whether handbooks containing a progressive, multi-step discipline and termination procedure created an enforceable employment contract); *Trombley,* 738 A.2d at 108 (issue of employment relationship properly submitted to jury where "handbook stated that '[a] formal progressive disciplinary procedure has been developed to ensure that employees are treated in a consistent and reasonable manner' "), *and Benoir,* 514 A.2d at 718 (existence of employment contract properly submitted to jury where "termination provisions contained in the employee handbook set up a three-step disciplinary procedure for violation of listed rules").

Second, Nemlich's statement that she would "probably" talk with an employee if the employee failed to "treat the customer as the boss" is not proof that such "talks" are clearly established and uniformly and consistently practiced throughout the company so as to constitute an enforceable promise to terminate

an employee only after a "talk" occurs. *Compare Benoir,* 514 A.2d at 718 (existence of implied employment contract properly submitted to jury where "defendant's plant manager conceded that management referred to the [three-step] handbook [disciplinary procedure] *whenever* an issue arose concerning the possible discharge of a company employee") (emphasis added), *with Ross,* 665 A.2d at 585–86. Furthermore, even if disciplinary "talks" are clearly established practices, there is no evidence employees must receive a talk before they can be terminated for reasons unrelated to their treatment of customers. *Cf. Madden v. Omega Optical, Inc.,* 165 Vt. 306, 683 A.2d 386, 389–90 (1996) ("Even if the handbook modified plaintiffs' at-will status with respect to unsatisfactory performance by creating a disciplinary procedure ... plaintiffs could still be fired for reasons other than poor performance.") (citing *Foote,* 613 A.2d at 1280; *LeBlanc,* 972 F.Supp. at 831 & 831 n. 1).

 Third, that Nemlich reviews an employee's job performance appraisal before termination is not proof of an objective and definitive promise by VCS, *clearly communicated to employees,* that terminations will occur only after VCS management reviews the appraisals and finds good cause for termination. *Cf. Madden,* 683 A.2d at 390 ("[E]ven if the [company] president believed in the existence of a company-wide policy of terminating employees only for cause, [summary judgment is warranted since] plaintiffs have not presented any evidence tending to show that the president ever communicated that belief to the employees.").

 Finally, while "[t]he mere inclusion of boilerplate language providing that

the employee relationship is at will cannot negate any implied contract," *Farnum,* 671 A.2d at 1254, the conspicuous placement of the disclaimer that the VCS Handbook is not a contract supports the view that VCS is not contractually bound by any Handbook provisions, *see Ross,* 665 A.2d at 583–84 ("an employer may not always be bound by statements if it *conspicuously* and effectively states that the policy is not intended to be part of the employment relationship") (emphasis added); *Mecier v. Branon,* 930 F.Supp. 165, 169 (D.Vt.1996) (disclaimer located on the first page of an employee handbook stating "[the handbook] is not intended as a contract or agreement for employment" "indicates [the company's] intent not to bind itself by the policies set forth in the manual").

Accordingly, Green's breach of contract claim must fail.[3]

### B. *Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing*

 Green's claim for breach of an implied covenant of good faith must be dismissed because Vermont law does not " 'recognize the implied covenant of good faith and fair dealing as a means of recovery where the employment relationship is unmodified and at-will.' " *Dicks v. Jensen,* 768 A.2d 1279, 1286 (Vt.2001) (quoting *Ross,* 665 A.2d at 586); *see Madden,* 683 A.2d at 391.

### C. *Count III: Age Discrimination Under the Vermont Fair Employment Practices Act*

 Green claims age discrimination under the Vermont Fair Employment Practices Act ("VFEPA"). *See* Vt.Stat. Ann. tit. 21, § 495(a).[4] "The standards

---

**3.** The Court declines to rule on the question whether ERISA preempts the breach of contract claim.

**4.** The VFEPA provides remedies for at-will employees. *See Ross,* 665 A.2d at 586.

and burdens of proof to be applied under [V]FEPA are the same as those under Title VII of the federal Civil Rights Act of 1964." *Carpenter v. Cent. Vt. Med. Ctr.,* 170 Vt. 565, 743 A.2d 592, 594 (1999) (entry order) (citing *Hodgdon v. Mt. Mansfield Co.,* 160 Vt. 150, 624 A.2d 1122, 1128 (1992)); *cf. Lavalley v. E.B. & A.C. Whiting Co.,* 166 Vt. 205, 692 A.2d 367, 369 (1997) (federal court interpretations of Title VII are persuasive but not binding authority on the interpretation of the VFEPA) (citing *Hodgdon* ); *Ross,* 665 A.2d at 586 ("The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, and its precedent provide useful analytical tools [in deciding a claim under VFEPA]."); *Gadbois v. Rock–Tenn Co.,* 984 F.Supp. 811, 818 (D.Vt.1997) ("The ADEA and Vermont FEPA are analyzed under the same framework as Title VII."). "Under this framework ... a plaintiff must first establish a *prima facie* case of age discrimination." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). "Once the plaintiff has made out a *prima facie* case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions." *Id.* "If the employer articulates such a reason, the presumption of age discrimination dissolves, and the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that age discrimination was the true reason for the adverse employment action." *Id.*

 To establish a *prima facie* case of age discrimination, a plaintiff must show four things: (1) she was in the protected age group; (2) she was qualified for the job; (3) she was terminated; and (4) the circumstances surrounding her termination permit an inference of age discrimination. *See id.; Carpenter,* 743 A.2d at 594–95; *Ross,* 665 A.2d at 586–87. The burden of

proof in the *prima facie* case is "relatively light." *Carpenter,* 743 A.2d at 595.

When asked to explain the factual basis for her discrimination claim, Green testified as follows:

A. I'm 52 years old. I have worked at Vermont Country Store for four years, ten months. I have experience in what I do. I hired someone 30 years old in November, who has little or no experience. She is still there; I am not. And there was no discussion about, perhaps, options of what we could do with her and what we could do to save me. So, therefore, I did not feel valued as an employee.

And I also looked as [sic] it like: I'm 52 and I'm gone, with experience, and have a higher salary and benefits package. And here is a person 20 years, 22 years younger, with little experience, at less salary and less benefits package, and she is still there.

Q. At any time, did anybody at Vermont Country Store say anything to you that seemed discriminatory towards your age?

A. No.

Paper 25, Ex. B, at 136–37.

Green undoubtedly satisfies the first three elements of the *prima facie* case. Her claim fails, however, under the fourth element because there is no evidence Moriarty replaced Green; Moriarty assumed a different job title with mostly different job responsibilities and lesser management authority. *Cf. Abdu–Brisson,* 239 F.3d at 468 (the inference of discriminatory intent can be drawn where the employer seeks to fill the discharged plaintiff's job position with persons of the plaintiff's qualifications). Moreover, as Green concedes, the GFC audit—not discriminatory intent—

"led directly" to her termination. Paper 28, at ¶ 6.

Even if Green has demonstrated a *prima facie* case of age discrimination, her claim would fail because VCS—by citing the GFC audit recommendations—articulated a legitimate business reason for Green's termination, and Green fails to meet the ultimate burden that age discrimination was the real reason for her termination. *See Schnabel v. Abramson,* 232 F.3d 83, 88, 90–91 (2d Cir.2000) (even where a *prima facie* case of age discrimination exists, summary judgment for defendant was appropriate because 60–year old plaintiff who was replaced by 31–year old worker failed to present evidence age was a determinative factor in defendant's decision to fire him).

Accordingly, Count III of Plaintiff's Complaint must fail.

### III. *Conclusion*

For the reasons stated herein, it is hereby **ORDERED** that Defendant The Vermont Country Store's Motion for Summary Judgment is **GRANTED.**