# Charles S. Taylor v. National Life Insurance Co., John H. Harding and Mark J. Levesque

[652 A.2d 466]

No. 92–389

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed December 17, 1993

Motion for Reargument Denied March 17, 1994

*Leslie C. Pratt* and *Robert Mello*, South Burlington, for Plaintiff-Appellant.

*Robert S. Burke*, Montpelier, for Defendants-Appellees.

**Dooley, J.** Plaintiff Charles Taylor brought a wrongful discharge suit against defendants National Life Insurance Company and two of its officers individually. Plaintiff's complaint included seven different bases for recovery: claims resting on theories of discrimination on the basis of age or handicap condition under both disparate treatment and disparate impact doctrines, on theories of contract and promissory estoppel, and on the basis of negligence and intentional infliction of emotional distress. The court allowed the claims based on age and disability discrimination to go to the jury, which found for defendant National Life and the individual defendants. The court granted a directed verdict on the latter four claims. Plaintiff now appeals solely the grant of a directed verdict to National Life on

the breach of contract and promissory estoppel claims.[1] We affirm in part and reverse in part.

Plaintiff began his career with National Life in January 1966. By 1986, he had risen to officer status in the corporation and was running National Life's User Information Center servicing National Life's computer operations. He developed heart disease and had a triple bypass operation in October of 1985, but returned to work within a month. In February 1986, the plaintiff's department was reorganized and renamed the Automation Support Department. National Life split responsibility for its computer operations between plaintiff and Greg Doremus; plaintiff continued to oversee internal computer operations while Doremus took on management of National Life's field staff computer operations. A year later, the Automation Support Department was again reorganized. Plaintiff was placed in an enhanced job that carried with it greater responsibility. Award of the new job title and associated increased salary, however, was made contingent upon plaintiff's satisfactory performance of the job in the ensuing six months. Plaintiff's supervisor told him that he would be evaluated after six months and either be given the additional salary or be given another position at a lower job grade.

Prior to 1986, National Life enjoyed sound financial health, but in 1986, its financial picture began to change. It suffered losses of $38 million in fiscal year 1986, and by the third quarter of fiscal year 1987 had losses of an additional $47 million. As a result, in early 1987, National Life implemented a program aimed at reducing operating expenses by about ten percent, or close to $8 million in total savings. Plaintiff was aware of and participated in the expense reduction efforts, including discussions about reducing his own staff.

In September 1987, National Life offered an early retirement plan to 163 employees; ninety-two persons accepted the offer. Plaintiff, age forty-nine at the time, was eligible for the plan, but chose not to take early retirement because his pension

---

[1] Plaintiff appealed from the directed verdict without specifying that the appeal applied solely to National Life. He has not in his brief mentioned his claims against the individual defendants or argued why these claims should have been allowed to go to the jury. Therefore, we have considered plaintiff's claims only with respect to National Life.

would have been small. National Life then began to reduce staff through layoffs, eliminating forty-nine jobs, including the one occupied by plaintiff. Plaintiff's work overseeing internal computer operations was merged with Doremus' work overseeing field computer operations in a new position. Plaintiff's supervisor chose Doremus, who was in his early thirties at the time, for the new position. Two assistant director jobs reporting to Doremus became available in computer operations at this time, but they were filled by other people.

Because plaintiff's position was eliminated, he was laid off. He was neither offered the chance to apply for nor did he seek either of the assistant director jobs that were filled by others. He did not find another job within National Life or with any other company. He was given a severance package and was also able to elect the early retirement plan to receive a pension.

## I.

■■ On appeal plaintiff contends that the trial court improperly granted National Life's motion for a directed verdict on his breach of contract and promissory estoppel claims. "When reviewing a trial court's grant of a directed verdict, we must view the evidence in the light most favorable to the nonmoving party, excluding any modifying evidence; a directed verdict is not proper if any evidence fairly and reasonably supports the nonmoving party's claim." *Meller v. Bartlett*, 154 Vt. 622, 623–24, 580 A.2d 484, 485 (1990). Further, "we will uphold the trial court where the nonmoving party has failed to present evidence on an essential element of [the] case." *Id.* at 624, 580 A.2d at 485.

Plaintiff contends that the jury could find that his employment agreement with National Life was not at-will, and had, in fact, been transformed from an at-will agreement to a contract for employment that precluded National Life from terminating him during its 1987 staff downsizing. For purpose of analysis, it is helpful to break down plaintiff's overall claim into four main issues: (1) whether the written offer of employment to plaintiff, oral representations made to plaintiff, and National Life's personnel manual were sufficient to present a jury issue on whether there was an implied contract that plaintiff could be terminated only for good cause; (2) whether the economic con-

ditions faced by National Life created good cause; (3) whether the jury could find plaintiff was terminated for a different reason; and (4) whether the events surrounding plaintiff's 1987 conditional promotion and layoff could be found to have created a special contract that was breached. We address each of these issues in turn. We start with the basic implied-contract issue.

## II.

Plaintiff bases his overall contract theory on three main items. The first is his 1966 employment letter, which stated, in part: "Continuous employment with [National Life] is subject to one's performing in an entirely satisfactory manner . . . ." Plaintiff argues that such language indicates that he could be terminated only if his performance was unsatisfactory. National Life responds with additional language from the letter: "It is understood that employment may be terminated by the employee or by the Company upon reasonable notice if the employment arrangement has not worked out satisfactorily." It argues that the additional language shows an at-will employment contract, allowing the employer to terminate for any reason or no reason.

Second, plaintiff relies on statements made at the time of his hiring that National Life was a stable employer and "if you did your job . . . you could expect . . . to stay there and . . . retire from there." Consistent with these statements, National Life's Vice President of Human Relations testified that if there was no misconduct, "job security could be expected, I would say that was a cultural expectation."

Third, plaintiff relies on statements in the personnel policy manual. The most important of these are:

(1) "It is paramount that each individual be treated fairly, uniformly, and impartially . . . ."

(2) "It is Company policy to make every effort to avoid involuntary terminations. Discharge is of course the severest form of disciplinary action and requires careful consideration before being resorted to."

(3) "Only after every possibility has been explored should you 'give up' on an employee and consider termination . . . ." [The manual lists three steps to be taken before termination].

(4) "The following are circumstances which may warrant termination." [The manual lists and describes "Misconduct," "Attendance" and "Inadequate Performance."]

(5) "Unless a serious wrong has been committed, the supervisor should take progressive disciplinary actions, with the severity increasing with each offense."

(6) When discipline is imposed the supervisor must "[g]ive the employee the right to appeal."

The personnel policy manual made no reference to termination because of downsizing or reductions in force.

■ It is helpful to recapitulate our decisions on employment contracts and grounds for termination. A basic precept of employment contract construction is that "an employment contract for an indefinite term is an 'at-will' agreement, terminable at any time, for any reason." *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 570, 613 A.2d 1277, 1279 (1992). This is, however, "simply a rule of contract construction" that can "be overcome by evidence to the contrary." *Id.*

We began to define what could be "evidence to the contrary" in *Sherman v. Rutland Hospital, Inc.*, 146 Vt. 204, 500 A.2d 230 (1985). In that case, plaintiff received defendant's personnel policy manual as part of the hiring negotiation. The manual set forth a progressive discipline process, ending with termination. Upon commencing work, plaintiff signed a statement that he had read and understood the manual. Plaintiff was eventually fired because the employees he supervised complained about his management style. In his wrongful termination suit, the jury found that plaintiff's employment contract included the disciplinary grounds and procedures in the manual and that the manual requirements were breached.

This Court affirmed, holding that the employee and employer could bargain for, and agree to be bound by, termination provisions set forth in the personnel manual, even if the bargain applies only to the employee before the court and not the entire employee population. *Id.* at 207–08, 500 A.2d at 232. We noted that the case involved an alleged bilateral agreement to make the manual terms part of the employment agreement and left for another day "whether the employee manual itself created enforceable contract rights generally." *Id.* at 208, 500 A.2d at 232.

The question left open in *Sherman* arose in *Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 514 A.2d 716 (1986). The Ethan Allen personnel policy manual was distributed during employee orientation, after the initial hiring, and the employee was required to sign the manual, which was then placed in the employee's personnel file. *Id.* at 271 n.2, 514 A.2d at 718 n.2. The jury found that "this handbook constituted a part of a binding and enforceable contract between the parties," but the employer did not appeal this point. *Id.* at 270–71 & n.2, 514 A.2d at 718 & n.2.

*Benoir* is also instructive because the court, not the jury, found that the manual required termination only for cause. See *id.* at 271, 514 A.2d at 718. We upheld this determination because the relevant manual provision "cannot be construed as being consistent with an at-will employment relationship."

Four months before *Benoir* we decided *Larose v. Agway, Inc.*, 147 Vt. 1, 508 A.2d 1364 (1986), a decision that on the surface appears inconsistent with *Benoir*. In *Larose*, the plaintiff stipulated that "the policies and procedures in the pertinent policy manual are adopted, enforced, implemented, and amended by Agway unilaterally," and that "the provisions in the manual are not negotiated for by employees, either at the time of hiring or at such time as Agway chooses to amend the manual." *Id.* at 3, 508 A.2d at 1366. Because of that stipulation, we concluded it was proper for the trial court to grant summary judgment for the employer as "plaintiff can not prevail on the basis of a specific employment agreement." *Id.* We also held that the plaintiff could not recover based on promissory estoppel because he did not allege he was aware of, or relied upon, the provisions of the manual in deciding to remain in the defendant's employment. *Id.* at 4, 508 A.2d at 1366.

More recently, in *Foote*, 158 Vt. at 571, 613 A.2d at 1279–80, we noted that some courts have held that an employer may unilaterally modify an at-will employment contract by use of a manual on which it intended employees to rely, but we did not resolve whether unilateral modification was enforceable in Vermont. Instead, we upheld a wrongful discharge verdict based on promissory estoppel even though the jury also found an at-will employment relationship. *Id.* at 571–72, 613 A.2d at 1280. In *Foote*, unlike *Larose*, there was specific evidence that the plaintiff read the manual, relied upon it by filing grievances, and was

fired for exercising his rights under the manual. See *id.* at 568, 613 A.2d at 1278. This evidence was sufficient for the jury to find liability based on promissory estoppel. *Id.* at 573, 613 A.2d at 1281.

■ To decide this case, we must clarify the tension between *Larose* and *Benoir* with respect to personnel manual provisions. We join the many courts that have held that personnel manual provisions inconsistent with an at-will relationship may be used as evidence that the contract of employment requires good cause for termination despite the fact that the manual was not part of the initial employment agreement. See, e.g., *Leikvold v. Valley View Community Hosp.*, 688 P.2d 170, 174 (Ariz. 1984); *Foley v. Interactive Data Corp.*, 765 P.2d 373, 387, 254 Cal. Rptr. 211, 225 (1988); *Duldulao v. Saint Mary of Nazareth Hosp. Center*, 505 N.E.2d 314, 318 (Ill. 1987); *Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880, 892 (Mich. 1980); *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn. 1983); *Woolley v. Hoffman-La Roche, Inc.*, 491 A.2d 1257, 1264 (N.J. 1985). We recognize that this holding draws on aspects of both unilateral contract formation and promissory estoppel. We agree with the rationale for the rule stated in the leading case of *Toussaint v. Blue Cross & Blue Shield of Michigan*:

> While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each em-

ployee. The employer has then created a situation "instinct with an obligation."

292 N.W.2d at 892. See generally Befort, *Employee Handbooks and the Legal Effect of Disclaimers*, 13 Ind. Rel. L.J. 326, 345–47 (1992). To the extent *Larose* is inconsistent with this holding, it is overruled.

■ We conclude that the content of the personnel policy manual was sufficient for a jury to find that the employment contract restricted defendant to terminating employees only for cause.[2] The language is similar to that we found sufficient in *Sherman*. It contains the same commitment to a progressive discipline system.

Defendant raises two additional arguments against this conclusion. First, defendant argues that the manual was intended only to provide guidance to management personnel, and not to provide rights to employees, and it was distributed solely to supervisors. Although we agree that a limited-purpose manual might, in some instances, not be sufficient to establish contractual rights, see *Triplett v. Electronic Data Sys.*, 710 F. Supp. 667, 673–74 (W.D. Mich. 1989); *Skramstad v. Otter Tail County*, 417 N.W.2d 124, 126–27 (Minn. Ct. App. 1987), we cannot agree that this theory can be applied here.

Certain of the manual information is presented in the "Employee Policies and Benefits" handbook, which is distributed to all employees. The handbook is not in evidence so we cannot determine what it covers. It is clear, however, that the manual is the official National Life policy while the handbook is considered an explanation of that policy. Thus, the manual provides:

> The personnel policies, practices, and procedures of National Life extend to every individual, in every aspect of his/her employment with the company. . . . It is the purpose of this Manual to help bring this about by presenting in one place, organized and indexed for ready reference, a clear and definite explanation of all existing Company personnel policies and procedures.

---

[2] Because of this holding, we have not reached plaintiff's promissory estoppel theory with respect to the manual, hiring letter and oral statements. If accepted, this theory would have added nothing to our conclusion on the contract theory.

. . . .

>[S]hould there be any conflict of information [with the employee handbook], the Manual is binding.

The manual is the official expression of National Life policy, binding on all employees, and can be considered in determining whether defendant was contractually bound to terminate only for good cause.

Second, defendant argues that the hiring letter makes it clear that it can terminate without cause. As noted above, both sides have cited different language from the hiring letter to support their cause. We conclude the letter is ambiguous, and the jury could weigh it in evaluating each side's position.[3] See *Diggs v. Pepsi-Cola Metro. Bottling Co.*, 861 F.2d 914, 919 (6th Cir. 1988) (jury could find just cause contract existed when plaintiff was told he would not be dismissed if he was "doing the job").

## III.

■ Because the jury could find that a contract existed restricting defendant to terminating plaintiff's employment solely for good cause, we must face the next issue: whether the economic circumstances that required National Life to lay off employees to reduce expenses constituted good cause to terminate plaintiff. Without exception, courts that have considered the question have held that economic circumstances that necessitate employer layoffs constitute good cause for termination. See, e.g., *Gianaculas v. Trans World Airlines, Inc.*, 761 F.2d 1391, 1395 (9th Cir. 1985); *Zoerb v. Chugach Elec. Ass'n*, 798 P.2d 1258, 1262 (Alaska 1990); *Clutterham v. Coachman Indus., Inc.*, 215 Cal. Rptr. 795, 797 (Ct. App. 1985); *McCart v. J. Walter Thompson USA, Inc.*, 469 N.W.2d 284, 287 (Mich. 1991); *Linn v. Beneficial Commercial Corp.*, 543 A.2d 954, 957 (N.J. Super. Ct. 1988). The rule is supported by important policy considerations. As the Michigan Court of Appeals emphasized:

>To hold otherwise would impose an unworkable economic burden upon employers to stay in business to the point of

---

[3] National Life also points out that the hiring letter in effect at the time of plaintiff's termination, as contained in the manual, is different and clearly specifies the at-will nature of the employment. The new letter was not sent to plaintiff. There is no reason to hold it binds him. By comparison, it does emphasize the ambiguity in the phrasing of the earlier letter.

bankruptcy in order to satisfy employment contracts and related agreements terminable only for good or sufficient cause.

*Friske v. Jasinski Builders, Inc.*, 402 N.W.2d 42, 44 (Mich. Ct. App. 1986). Similarly, the New Jersey Superior Court has noted that "history is replete with examples of technological and business innovations which have created new markets and destroyed old ones, thereby necessitating changes and shifts in the work force." *Linn*, 543 A.2d at 957. Attempting to second-guess these shifts would be self-defeating as well as an inappropriate interference in managerial discretion. See *Clutterham*, 215 Cal. Rptr. at 797. We adopt this rule.

Although plaintiff argues that economic circumstances cannot be good cause, he does not dispute that defendant faced significant losses and was required to cut expenses substantially to remain profitable. There is no dispute that economic circumstances required layoffs at the time plaintiff was terminated, and good cause existed.

■ Plaintiff makes two arguments against the application of the economic necessity rule in these circumstances. First, he argues that National Life owes him a special responsibility because it is an insurance company that provides income security to members of the public. National Life's public responsibilities warrant special regulation to protect its policyholders and other members of the public. As long as it must function in a competitive marketplace, we do not see a special justification for job protection for its employees. Indeed, providing job protection to employees in difficult economic times can only impair the interests of policyholders and the public at large. Plaintiff's argument leads to rejection of his claim.

■ Second, plaintiff argues that the issue is one of contract construction, and the contract, as evidenced by the personnel manual, does not authorize termination for this purpose. We accept that an employer could bind itself to continue employment of an employee despite the fact the employer is not making a profit. See *Stull v. Combustion Eng'g, Inc.*, 595 N.E.2d 504, 507 (Ohio Ct. App. 1991). In view of the grave consequences of such a policy and the impossibility of compliance in serious economic difficulties, see Restatement (Second) of Con-

tracts § 261 (1981) (contract may be discharged by supervening impracticability), we will require such a promise to be clear and specific. See *Boynton v. TRW, Inc.*, 858 F.2d 1178, 1184 (6th Cir. 1988). See generally Restatement (Second) of Contracts § 203 (interpretation of contract that gives "reasonable, lawful, and effective meaning to all the terms is preferred").

There is no clear and specific promise to continue employment despite economic losses in this case. Instead, plaintiff argues from the absence of a specific authorization for economically motivated reductions in force. Although the list of grounds for termination in the manual all address employee discipline, there is no clear and specific statement that these are the only possible grounds for termination and that a termination as part of a reduction in force is impermissible. Plaintiff's argument based on the manual is unavailing.

Additionally, we are not willing to read into the oral statements that accompanied plaintiff's hiring a commitment to life employment despite subsequent economic circumstances. The statements express the hope for a long-term relationship, but fall short of a promise of a lifelong job irrespective of the economic circumstances of the employer. See *Fregara v. Jet Aviation Business Jets*, 764 F. Supp. 940, 947 (D.N.J. 1991); *Wilder v. Butler Mfg. Co.*, 533 N.E.2d 1129, 1131 (Ill. Ct. App. 1989); *Rowe v. Montgomery Ward & Co.*, 473 N.W.2d 268, 273 (Mich. 1991); *Scott v. Extracorporeal, Inc.*, 545 A.2d 334, 337 (Pa. Super. Ct. 1988).

## IV.

Plaintiff claims that even if economic circumstances constitute good cause and that National Life faced such circumstances when it laid him off, he was entitled to have the jury determine whether the economic circumstances were the true reason for his termination. He alleges that the adverse economic circumstances were merely a pretext for his termination.

Plaintiff's argument fails because the only other factors he claims motivated his termination were his age and his disability, and these claims were fully litigated with the jury finding against him on these theories. He is precluded from relying on this alternative theory of National Life's motivation in support of the breach-of-contract claim. See *Trepanier v. Getting Orga-*

*nized, Inc.*, 155 Vt. 259, 266 n.3, 583 A.2d 583, 588 n.3 (1990) (rejecting plaintiff's argument that defendants' alleged age discrimination interfered with parties' contractual relationship as federal jury had previously found no age discrimination).

■ To reach the jury on a pretext claim, plaintiff must present some evidence that his termination was not for the reason specified by National Life. See *Braun v. Alaska Commercial Fishing & Agric. Bank*, 816 P.2d 140, 144 (Alaska 1991); *McCart*, 469 N.W.2d at 287. Apart from the evidence going to the discrimination claims that were resolved against him by the jury, he has presented no evidence to rebut the reasons given by National Life. The directed verdict was proper on the pretext claim.

## V.

Plaintiff's final claim, that the events surrounding his 1987 conditional promotion and layoff created a special contract, requires a more detailed explanation of the events in the year prior to plaintiff's termination. Again, we must view the facts in the light most favorable to plaintiff.

In February 1987, plaintiff was promoted provisionally to the upgraded job of director of the User Information Center. He was informed, however, that he would not receive the salary that went with the promotion, or the permanent position, unless he proved himself for six months. His supervisor detailed areas of concern in which plaintiff had to show improvement. He was told that he would be evaluated after six months and either receive the position permanently or be offered "some other job of a lower grade."

Shortly thereafter, plaintiff's supervisor died, and a new supervisor was appointed. The six-month period went by and plaintiff was not evaluated and did not receive the raise for the new position. By the end of the summer, the major concern in National Life was reducing expenses. The company determined that it had to eliminate positions, and it developed "corporate downsizing" guidelines. Managers were to look first at positions "in terms of functions and the business necessity of those functions." If a position were eliminated, the occupant would be laid off. If there was more than one incumbent, the manager was to

look at performance appraisals over the prior three years and keep those with the highest ratings "if clear distinctions in performance can be shown." Those with the most seniority with National Life were to be retained when there were not sufficient performance differences. Plaintiff received a copy of these guidelines.

By mid-September, plaintiff's then supervisor decided to eliminate plaintiff's job, along with that held by Greg Doremus, and to create one new job combining both functions. He discussed how to choose between Doremus and plaintiff in filling the new position with the Vice President of Human Relations and generally followed the downsizing requirements. He conducted an annual evaluation on November 1, 1987 and rated plaintiff's performance "satisfactory" while rating Doremus's performance "superior." Based largely on this evaluation, he eliminated plaintiff's job on November 16, 1987 and gave the new job to Doremus. Plaintiff was not offered another job.

Plaintiff has two claims arising out of these events: (1) his evaluation was manipulated to reach a predetermined result so that the new job could be offered to Doremus, and not to him; (2) there was a specific promise of fair dealing connected to the February 1987 promotion, and the breach of this promise resulted in his termination.

■ We agree that, even though economic necessity represents good cause to terminate plaintiff, "he is not precluded from challenging the procedure followed . . . in discharging him." *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 500 (6th Cir. 1990); see also *Patton v. University of Chicago Hosps.*, 706 F. Supp. 627, 630 (N.D. Ill. 1989) (employer's reduction-in-force policy may create "enforceable contractual rights"). Other courts have found contracts in reduction-in-force policies and procedures even when there is no overall contract to terminate only for good cause. See, e.g., *Crain Indus., Inc. v. Cass*, 810 S.W.2d 910, 913–15 (Ark. 1991). Thus, the claim based on the reduction-in-force policy is separate from that based on the employment contract.

■ Viewed in the light most favorable to plaintiff, the evidence suggests that National Life followed the downsizing guidelines, although technically they did not apply to the selec-

tion of an employee for a new position created during downsizing. Any manipulation of the evaluation process to avoid giving the new position to plaintiff and resulting in his termination could be actionable if the jury found that a contractual obligation was created by the guidelines and their use in the unique circumstances of plaintiff's case. Plaintiff also presented sufficient evidence to raise a question about the fairness of the evaluation and its use in his termination. He had received "Superior" ratings in the past. His supervisor had no criticism of his work performance and failed to do the promised six-month evaluation. The supervisor was aware that the outcome of the evaluation could determine who would be terminated. We conclude that this theory should have been presented to the jury.

We do not believe that plaintiff's alternative claim should have been submitted to the jury. Plaintiff has argued this both as a contract claim and one based on promissory estoppel. The events involved add little to plaintiff's existing contract theory. At best, they show an independent contract not to terminate plaintiff from the position established in February 1987 without good cause and to offer plaintiff a lower position if his performance was unsatisfactory. This contract, like that established from the personnel policy manual, does not clearly and specifically restrict terminations caused by economic necessity. Thus, the economic necessity National Life faced established good cause to terminate plaintiff under this later contract.

Plaintiff's argument is stronger when based on a promissory estoppel theory. In *Foote*, we held that "promissory estoppel may . . . provide a remedy for wrongful discharge . . . and may be used affirmatively, if the elements are present." 158 Vt. at 571, 613 A.2d at 1280 (citations omitted); see also *Continental Air Lines v. Keenan*, 731 P.2d 708, 712 (Colo. 1987) (employee may enforce term of employment agreement even if requisites for formation of contract not found). We have required the elements of promissory estoppel set out in the Restatement (Second) of Contracts § 90(1):

> "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or for-

bearance is binding if injustice can be avoided only by enforcement of the promise."

*quoted in Foote,* 158 Vt. at 573, 613 A.2d at 1281.

For purpose of analysis, we can assume that plaintiff relied upon the promise of his supervisor by taking the new job, without proper compensation, in February 1987. We can also assume that if plaintiff had rejected the promotion, he would have remained in a lower job and avoided the layoff that later occurred. The detriment was not, however, caused by a breach of the promise. The evaluation, albeit belated, showed that plaintiff performed satisfactorily in the job and was entitled to it on a permanent basis. Thus, plaintiff was not entitled to be offered a lower job. The elimination of the job for economic reasons was an independent event unconnected to the promise. There is no injustice that can be corrected by enforcement of a promise.

*Affirmed in part; reversed in part and remanded for proceedings not inconsistent with this opinion.*