2004 VT 73

# Lois Havill v. Woodstock Soapstone Company, Inc.

[865 A.2d 335]

No. 03-032

Present: Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.),
Specially Assigned

Opinion Filed August 13, 2004
Motion for Reargument Denied October 18, 2004

*Cathryn C. Nunlist* of *Stebbins Bradley Harvey & Miller, PA,* Hanover, New Hampshire, for Plaintiff-Appellee.

*James M. Morrissey* and *Thomas Hayes* of *Eaton & Hayes, P.C.,* Woodstock, for Defendant-Appellant.

¶ 1. **Johnson, J.** Defendant Woodstock Soapstone Company appeals the trial court's conclusions that plaintiff Lois Havill had an implied employment contract with defendant and that defendant breached that contract when it discharged plaintiff without adhering to the procedures for just cause firings detailed in defendant's personnel policies. Defendant also appeals various aspects of the trial court's damage award of front and back pay as excessive or unwarranted. Plaintiff cross-appeals the trial court's damage award because it makes no provision for bonuses and wages plaintiff might have earned but for her improper discharge and because plaintiff claims the court made other errors calculating her award. We affirm the trial court's conclusions regarding the existence of the implied contract and defendant's liability for violating that contract, but remand for a recalculation of damages.

## I. Contractual Liability

¶ 2. Defendant manufactures wood-burning and gas-burning stoves. Plaintiff began working for defendant in 1982. She worked part-time at first and then full-time, until she was terminated in April 1987 when the company was experiencing financial difficulties. Plaintiff resumed employment with defendant in 1990 working initially as an independ-

ent contractor from her home and later that year as a part-time employee in defendant's office. Defendant made plaintiff a full-time employee in August 1994.

¶ 3. In 1994, defendant also issued and distributed personnel policies, which were the functional equivalent of a personnel manual. The policies detailed a process whereby an employee was entitled to two written warnings in a twelve-month period prior to termination for "willful or repeated violations, or exaggerated behavior not in the best interest of the company or its employees." Most significantly, the policies established a "just cause" requirement for the termination of defendant's employees with problems such as unauthorized absences, violation of safety procedures, theft, careless or faulty work, and incompatibility with other employees. According to the policies, employees' "responsibilities will often change, and responsibilities will often be broad and/or overlapping with responsibilities of other employees."

¶ 4. The trial court found that when plaintiff resumed employment with defendant in 1990 her duties included data entry, database maintenance, and mailings to prospective customers. The trial court's findings detail the expansion of plaintiff's responsibilities into the area of customer service and sales, primarily on the telephone and occasionally in the showroom. The trial court estimated, based on testimony of both plaintiff and defendant, that sales and customer service activities were twenty-five percent of plaintiff's work by 1997. Plaintiff received "very positive" performance reviews in 1995 and 1996 as well as a $1000 bonus in August 1997. The performance reviews in evidence indicated that plaintiff was steadily improving at sales and customer service on the telephone, though she remained reluctant to do this work. The reviews encouraged plaintiff to take a more active role in this regard. Plaintiff also testified that during the slow work seasons when she offered to go home without pay, defendant's president required her to stay so she could work the telephones, reasoning that if she even made one sale it would be worth it to the company.

¶ 5. Meanwhile, defendant's business was declining seriously for various market-related reasons. Many of defendant's competitors went out of business. This led defendant's president, Tom Morrissey, to reorganize the company by adding a line of gas-burning stoves and outsourcing in-house functions, including many of the letter shop and order fulfillment functions that comprised much of plaintiff's workload. As part of this reorganization, defendant hired Laura Scott to stream-

line the operation. There is no dispute that this reorganization was warranted by outside economic factors, that it actually occurred, and that it had a positive effect on the business.

¶ 6. All parties agree that tension developed between plaintiff and Scott soon after Scott's arrival. Plaintiff felt humiliated by the way Scott dealt with her. Scott and Morrissey began to perceive that plaintiff was resisting the reorganization. The conflict between Scott and plaintiff manifested itself in instances of plaintiff's "rude" and "insubordinate" conduct towards Scott. In response, Morrissey sent plaintiff a letter dated September 30, 1997, in which he stated, "As a courtesy to you, and in light of the length of time you have worked here, you are not being issued a written warning now," although a newer employee would have received one. The letter goes on to reprimand plaintiff for her unacceptable behavior toward Scott the prior week, to indicate that she was being temporarily relieved of her customer service duties, and criticized her for not voluntarily participating in a team building lunch for all employees.

¶ 7. The letter was written forty-one days before plaintiff was terminated. Nonetheless, Morrissey's letter states that "[t]o accommodate any additional growth we need customer service people who are flexible, professional and cooperative team players. I need to know if you will make a commitment to accommodate our needs. This decision is really yours to make." The letter also states that if plaintiff "cannot make this commitment now, and regularly in the future, then we will do everything we reasonably can to help [plaintiff] secure another job," but that Morrissey "would like to have [plaintiff] continue to work here" because Morrissey valued her hard work and dedication and considered her a friend.

¶ 8. On October 1, 1997, plaintiff entered into a written agreement with Morrissey and Scott in which they all pledged to cooperate as team members in the best interests of the company. Despite these efforts, defendant terminated plaintiff on November 10, 1997. According to plaintiff's testimony as recounted in the court's findings, when plaintiff asked Morrissey the reason for her termination, he replied "I don't know why. You just are." Plaintiff did not receive any written warnings prior to termination. Subsequently, plaintiff obtained her personnel file, which contained a memo dated November 10, 1997 indicating that her position had been eliminated due to lack of work. The memo also indicated that defendant would not object to plaintiff's

application for unemployment benefits and that the company would provide a written recommendation letter for plaintiff.

¶ 9. Defendant did in fact provide a recommendation letter for plaintiff authored by Morrissey. The trial court noted that the letter speaks of plaintiff in "fairly glowing terms." The letter lauds plaintiff as someone who would be a "big asset in a busy office which requires organization, dedication and sound office skills." Two weeks after providing plaintiff with the letter, defendant placed an ad in the Valley News seeking an "office whiz" who would be "a well organized person with fast and accurate typing and keyboard ability, basic computer literacy, and sound office skills." The advertisement indicated that the position was full-time with benefits, generous pay and incentives, and the company was growing. The evidence shows that Heather Dahlin responded to this advertisement and was hired. She worked for the company handling telephone inquiries, taking and processing orders, bookkeeping, and other miscellaneous tasks until she quit in November 1998.

¶ 10. By January 1998, defendant had hired three new customer service representatives. The trial court found that the new employees performed some of the functions that plaintiff had previously performed, though they were expected. to be more aggressive in turning routine inquiries into sales. The new customer service representatives received training and certification in defendant's products. Defendant did not offer plaintiff the opportunity to undergo such training.

### A. Defendant's Intent to Be Bound by Policies

¶ 11. Plaintiff's theory of liability is that defendant wrongfully terminated her employment in violation of an implied contract. As we stated in our earlier decision, the rule that employment contracts for indefinite terms are "at will" is one of construction, not one of substantive law. *Havill v. Woodstock Soapstone Co.*, 172 Vt. 625, 627, 783 A.2d 423, 427 (2001) (mem.). Thus, parties can modify the at will relationship according to the usual rules of contract. *Id.* We previously reversed and remanded the trial court's grant of summary judgment for defendant in this case with instructions for the court to determine whether defendant intended to be bound by the policies generally, and the just cause and progressive discipline provisions specifically. *Id.* at 629, 783 A.2d at 430. The trial court correctly answered both of these questions in the affirmative.

¶ 12. Though defendant's president Morrissey testified that he is not and should not be bound by the terms of the personnel policies, defendant concedes in its brief on appeal that it "has never claimed that the just cause provision is not binding." This concession comports with the trial court's finding that the language of the policies evinces defendant's intention to be bound by the provisions therein. The trial court reached this conclusion after observing that the policies were devoid of any disclaimer to the contrary. See *id.* at 628, 783 A.2d at 428 (employer must clearly state its intent not to be bound by its promulgated policies in order to avoid creating contractual liability). Instead, defendant's position on appeal is that the just cause provision in the policies applies only to employee misconduct, and not layoffs due to reorganization required by economic circumstances. This position appears to be consistent with the language of the policies, as well as our case law on implied employment contracts. See *Taylor v. Nat'l Life Ins. Co.*, 161 Vt. 457, 467-68, 652 A.2d 466, 473 (1993) (employer may bind itself to continue employment of an employee despite the fact that employer is not making profit, but such promise must be clearly and specifically stated).

¶ 13. The progressive discipline and just cause policy applied to such things as incompatibility with other employees, unauthorized absences, and faulty work. It included a provision for two written warnings. When defendant sent plaintiff a letter about her incompatibility with Scott, the letter indicated that it was not to be considered a written warning, but that if she had been a newer employee, a written warning would have been issued. The discussion of a written warning is an unmistakable reference to the progressive discipline procedure and the just cause provisions contained in defendant's policies. This, coupled with defendant's concession on appeal, is ample evidence to support the trial court's conclusion that defendant specifically intended to be bound by the just cause provisions and the progressive discipline procedures in the area of incompatibility with co-workers and other employee misconduct.

## B. Evidence of Pretext

¶ 14. After having determined that defendant and plaintiff did have an implied contract that plaintiff's employment would not be terminated without just cause and adherence to defendant's stated procedures, the court explored defendant's claim that the company

decided to outsource plaintiff's functions and eliminate her job in response to economic circumstances in the industry. As the trial court stated, "economic circumstances requiring layoffs may constitute good cause for termination." See *Taylor*, 161 Vt. at 466, 652 A.2d at 472. Nonetheless, "[a]n employer cannot use the defense of economic necessity as a pretext for discharges which would otherwise be subject to a just cause attack by the employee." *Havill*, 172 Vt. at 628, 783 A.2d at 429 (internal citations omitted). After reviewing all the evidence, the trial court rejected defendant's claim as pretext. The findings and undisputed evidence in the record reasonably support the trial court's conclusion on pretext. Accordingly, the conclusion must be upheld. *Schnabel v. Nordic Toyota, Inc.*, 168 Vt. 354, 357, 721 A.2d 114, 118 (1998) (trial court's conclusion will stand if reasonably supported by findings).

¶ 15. The crux of the dispute between plaintiff and defendant was whether plaintiff's position had been eliminated as part of the company's reorganization. Plaintiff prevailed below by demonstrating that significant portions of her job remained after the reorganization. Furthermore, plaintiff successfully attacked defendant's credibility by offering evidence that contradicts defendant's claim that her termination was contemplated as part of a planned, orderly reorganization.

¶ 16. The trial court found against defendant on the job elimination issue. Specifically, the court found that sales and customer service comprised at least twenty-five percent of plaintiff's job responsibilities by 1997 when she was terminated, and that the company did not eliminate the customer service positions. This finding was firmly grounded in evidence that, despite the reorganization, the company still handled roughly the same volume of inbound telephone traffic and still employed in-house customer service representatives to handle these calls. Morrissey testified that, although plaintiff did perform customer sales and service, the company expected customer service representatives hired after the reorganization to be more proactive in making sales and more technically proficient in addressing service issues. To this end, defendant provided the new hires with extensive training and certification courses in defendant's products. Defendant did not offer similar training opportunities to plaintiff at any time during her employment — even as her duties expanded from the manual tasks of the mail room to more technical telephone customer service. The job may have changed in part, but it did not go away and it did not change in a way that required qualifications that were different from those plaintiff possessed. Plaintiff was not given the chance to change with it

despite the clause in defendant's policies that states "responsibilities will often change, and responsibilities will often be broad and/or overlapping with responsibilities of other employees."

¶ 17. The court's findings further reveal that customer service and sales was not the only part of the job that remained. The trial court found, based on undisputed evidence, that after it terminated plaintiff, most of the data-entry tasks and mail room duties that plaintiff had previously performed were outsourced to individuals working from home. While defendant may not have been obligated to offer this work to plaintiff, the company's decision not to utilize plaintiff's services for a job defendant agreed she was qualified to perform reasonably supports the court's conclusion that plaintiff's termination had less to do with reorganization and more to do with behavioral issues. This conclusion is also supported by the fact that defendant had, at various times over the course of plaintiff's long employment with the defendant, outsourced contract work to her to perform from her home. See *Havill*, 172 Vt. at 629, 783 A.2d at 430.

¶ 18. Only two weeks after delivering plaintiff a letter of recommendation that praised her for "organization" and "sound office skills" such as data entry, database management, and work with customers in person and over the phone, defendant advertised for an "office whiz" who would be a "well organized person with fast and accurate typing and keyboard ability, basic computer literacy, and sound office skills." The court noted the striking similarities between plaintiff's qualifications as described by defendant and the profile of the employees that defendant almost immediately began seeking in the marketplace. In *Robertson v. Mylan Laboratories, Inc.*, a gender discrimination case, we accepted the employer's claim, as a nonpretext reason for denying the plaintiff a promotion, that a newly created position required different skills from those possessed by the plaintiff. 2004 VT 15, ¶¶ 31, 37, 176 Vt. 356, 848 A.2d 310. The plaintiff in *Mylan* failed to produce evidence that she possessed the skills and could meet the requirements of the job description promulgated by the employer. *Id.* ¶ 37. Here, by contrast, the skills required to perform the tasks that remained after the reorganization were indistinguishable from those that Morrissey attributes to plaintiff in his letter of recommendation. Moreover, this cannot fairly be characterized as a case about whether a business is entitled to downsize for economic reasons; the trial court found that defendant hired three new employees — including the "office whiz" —

by January 1998, approximately one month after plaintiff was terminated.

¶ 19. The court's findings also include the following excerpt from a letter that defendant sent to plaintiff just over one month before defendant terminated her: "to accommodate any additional growth we need *customer service people* who are flexible, professional and cooperative team players. I need to know if you will make a commitment to accommodate our needs. This decision is really yours to make. . . . I would like to have you continue to work here." (emphasis added). Coming from Morrissey, one of the primary architects of the reorganization, this letter is inconsistent with the claim that defendant had planned to release plaintiff all along because she lacked the skills required to fill the new positions. It demonstrates that Morrissey viewed plaintiff as a customer service representative and contemplated her continued employment with the company as it adapted to meet the challenges presented by the marketplace. This appearance of inconsistency is bolstered by the fact that the letter was sent after Laura Scott, the employee overseeing the reorganization, had been hired. In fact, plaintiff's "rude, insubordinate, and unacceptable behavior toward Scott" was the impetus for the letter.

¶ 20. The foregoing analysis of the findings and other undisputed evidence adequately supports the trial court's conclusion that defendant's claim regarding the elimination of plaintiff's job was pretext. Although the specific responsibilities may have changed somewhat, the core functions were retained and were performed by employees who were all hired not long after plaintiff was terminated.

¶ 21. At oral argument, defendant protested vigorously that the court erred in concluding that defendant's claim that it eliminated plaintiff's position was pretext because plaintiff did not make that argument at trial or in her pleadings. While this is literally true in the sense that plaintiff did not use the word pretext, the entire thrust of plaintiff's argument was that her position was not eliminated in the reorganization, and that defendant's proffered reason for terminating her was false. Black's Law Dictionary defines pretext as "[a] false or weak reason or motive advanced to hide the actual or strong reason or motive." Black's Law Dictionary 1206 (7th ed. 1999). Pretext is, therefore, a determination of credibility. Indicia of untruthfulness appear more readily in person than they do in the cold appellate record; thus the fact-finder's credibility determination is due great deference because it is based on the trial court's observation of the witnesses as

they testified. The court made no error by fashioning its judgment in response to the facts as they appeared at trial.

¶ 22. Defendant also finds fault in what it sees as the trial court's failure to specify what defendant's proffered reason was masking. To the contrary, the trial court's findings indicate that defendant terminated plaintiff because of her incompatibility with Laura Scott, the employee who was directing the reorganization. Findings 9-12 detail the friction between plaintiff and Scott that culminated in plaintiff's dismissal:

> On October 1, 1997 Plaintiff, Mr. Morrissey and Laura Scott entered into a written agreement regarding the conduct of their relationship and how they would cooperate as team members in the best interest of the company. Apparently these efforts did not eliminate the conflict and on November 10, 1997 Plaintiff was terminated.

Although the court could have been more explicit in drawing the link between this finding and its conclusion on pretext, the finding reasonably supports the conclusion as well as the court's ultimate disposition of the liability issue.

¶ 23. Defendant bound itself to the terms of an implied employment contract that entitled plaintiff to two written warnings before she would be terminated for just cause. Defendant breached that contract when it terminated her without warning, and thus is liable for damages.

## II. Damages

¶ 24. After concluding that defendant was liable for damages in contract, the trial court awarded plaintiff a total of $74,644 in principal damages plus $15,040 in prejudgment interest. Both parties have appealed various aspects of the damages award. Before addressing those arguments, we review the trial court's findings as they relate generally to the issue of damages.

¶ 25. Plaintiff worked for defendant for approximately ten years over the period from 1982 to 1997. For some of that time she worked as either an independent contractor or part-time employee, and for the final three years she worked full-time. At the time of her termination, she earned $10.75 per hour while working forty hours per week at defendant's office. Plaintiff earned a total of $23,360, including an

August bonus, working for defendant in 1997. The trial court estimated that she would have earned a total of $24,060, including an anticipated $700 December bonus, had she finished out the year in defendant's employ. The week before defendant terminated her, plaintiff told Morrissey that she was in good health, enjoyed her work, and planned to work for the company another ten years.

¶ 26. Plaintiff was able to find work at Morgan's Plumbing only three days after her termination. She worked thirty hours per week for a rate of $9.00 per hour. This work, which was always understood as temporary, ended in June 2000. Plaintiff was fifty-eight years old when defendant terminated her, and sixty-one when her employment ended at Morgan's. At this point, she decided to become self-employed because she was unable to find other work.

¶ 27. Plaintiff's self-employment consisted of performing typing for two businesses. She began working in 1990 with OT, now called Therapeutic Dimensions, and had continued to work for them while she worked for defendant as a supplement to her income. It does not appear from the record that she worked increased hours for Therapeutic after she became fully self-employed. Her second client, Wilson Associates, now known as Quest, hired her within days of her termination from Morgan's. Between these two clients, she works, on average, forty hours per week without benefits.

### A. Damages Period

¶ 28. The trial court calculated plaintiff's damages for the period beginning in calendar year 1998,* and ending in 2004 — a total period of seven years. This includes five years of back pay, i.e., lost wages up to the time of judgment, and two years of front pay — damages for lost future wages accruing after the date of judgment. See *Haynes v. Golub Corp.*, 166 Vt. 228, 238, 692 A.2d 377, 383 (1997) (defining front and back pay). "When front pay is allowed, the damages must be limited to a reasonable period of time, and the amount must not be speculative." *Id.* (internal citation omitted).

¶ 29. Defendant first challenges the damages award because, in its view, the damages period was twice as long as plaintiff's tenure as a full-time employee, and thus is unreasonable. We have previously

---

* The trial court's decision not to calculate damages from the date of termination was made in light of the generous severance package that defendant granted plaintiff. Neither party challenges this aspect of the award.

recognized that the length of employment prior to termination is a factor bearing on the determination that a front pay damage award is reasonable and not too speculative. *Trombley v. Southwestern Vt. Med. Ctr.*, 169 Vt. 386, 398, 738 A.2d 103, 112 (1999); *Haynes*, 166 Vt. at 238, 692 A.2d at 383. In the present case, we are satisfied that the overall relationship between employer and employee was sufficiently long-term to support the damages period. Defendant would have us focus narrowly on the approximately three and one-half years prior to plaintiff's termination, the period for which plaintiff was a full-time employee. In its first finding, however, the trial court detailed an employment relationship that began almost fifteen years before the date of termination, and comprised a total of ten and one-half years of service by plaintiff to defendant as an independent contractor, part-time employee and finally as a full-time employee.

¶ 30. Defendant also argues that this award is excessive because the period upon which it is based is unreasonable in light of its argument that plaintiff's job was eliminated by January 1999 at the latest. This argument is based largely on the same assertions and evidence defendant cited to contest the trial court's conclusion on liability. We have already affirmed the trial court's disposition and will not revisit the underlying issues as they pertain to damages.

¶ 31. Nonetheless, we remand to the trial court to consider another factor that could, in the trial court's discretion, support a damages award — with special attention to front pay — that spans a shorter period than that which it chose. Specifically, the trial court may assess whether defendant's evidence in any other way supported its claim that plaintiff would not have remained in defendant's employ until or beyond the normal retirement age of sixty-five. See *Barbour v. Merrill*, 48 F.3d 1270, 1280 (D.C. Cir. 1995) (court may consider, among other discretionary factors, defendant's evidence that indicates plaintiff would not have remained in the job until retirement); see also *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1057 (7th Cir. 1990) (although there was sufficient evidence to support conclusion of age-based discrimination, evidence regarding complaints about employee performance and tension with management "should not be ignored in making the front pay determination"). In the instant case, plaintiff has prevailed by showing that she was discharged for some reason other than economic circumstances, specifically, incompatibility with a supervisor. See *supra*, at ¶ 22. Accordingly, the trial court should be allowed to

balance this evidence against plaintiff's statements of her subjective intent to remain employed with defendant beyond her normal retirement age.

¶ 32. Plaintiff has also challenged the period over which damages were awarded as too short in light of the evidence. The trial court found that plaintiff intends to work until age seventy, and that she told Morrissey that she had planned to work for defendant until she was sixty-eight. After noting these findings, the trial court stated that "in her post-trial memorandum, plaintiff suggests an award 'based on the normal retirement age of sixty-five.'" (citation omitted). The trial court analyzed defendant's argument and then concluded that "plaintiff is reasonable in requesting compensation until she reached the age of 65."

¶ 33. Plaintiff contends that the trial court misunderstood her request. Our review of the post-trial memorandum supports plaintiff's position. The section heading of the memo to which the court alludes in its order expressly states that the "damages awarded by the court are insufficient to properly compensate the plaintiff." The memo cites, by number, the court's finding that plaintiff intended to work for the company for another ten years. The memo then states that "since the evidence clearly demonstrated that 'plaintiff planned to work *after* age sixty-five,' damages should have been awarded through 2009." (emphasis added; internal citation omitted). This language is not susceptible to the trial court's reading of it.

¶ 34. Notwithstanding the trial court's misapprehension of plaintiff's request, plaintiff is not automatically entitled to the additional damages she requests. In *Haynes*, we implied, in dicta, that a front pay award extending beyond the normal retirement age might be reasonable in that case if it was supported by evidence that plaintiff planned to work beyond the retirement age. 166 Vt. at 238, 692 A.2d at 383. While such evidence is cited in the court's findings here, our law does not compel the trial court to award damages that are co-extensive with the period that a plaintiff intends to work. The trial court's only responsibility is to make an award that is limited to a reasonable time and that is not too speculative when viewing all the evidence in the light most favorable to the plaintiff. *Id.*

¶ 35. Trial courts should be given considerable discretion in calculating awards for lost future income, because such awards are "inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty." *Williams v. Rubicon, Inc.*, 808 So. 2d 852, 862 (La. Ct. App. 2002) (internal citation omitted). This

deference, however, is limited by the principle that the trial court's findings must sufficiently demonstrate how it exercised its discretion in light of the evidence. The findings here indicate that plaintiff planned to work for defendant beyond the age at which the trial court capped her damages, but also that plaintiff had performance-related issues that may have eventually led to her discharge at some earlier point. Accordingly, the issue of how many years worth of damages plaintiff should be awarded is remanded to the trial court.

## B. Mitigation

¶ 36. Defendant next contends that the court erred in holding that plaintiff had fully mitigated her damages. An employee claiming wrongful discharge has a general duty to mitigate damages. *In re Lilly*, 173 Vt. 591, 593, 795 A.2d 1163, 1168 (2002) (mem.). Mitigation, in the context of an employment dispute, requires that the employee make a "good faith effort to find suitable alternative employment." *Schnabel*, 168 Vt. at 361, 721 A.2d at 119. When an employer is claiming that the employee did not properly attempt to mitigate damages, the burden of proof is on the employer to show such failure. *Lilly*, 173 Vt. at 593, 795 A.2d at 1168. This requires that the employer show both that suitable work existed and that the employee did not make reasonable efforts to obtain it. *Id.* Suitable employment is that which is "substantially equivalent to the position lost and suitable to a person's background and experience." *Id.* at 593, 795 A.2d at 1169.

¶ 37. In the trial court's view, plaintiff had sufficiently mitigated her damages through her work first with Morgan's Plumbing, and later by getting typing work from Quest. The trial court concluded that plaintiff was "very conscientious about mitigating her damages by obtaining other work in a timely manner" even though she no longer worked full time for any one employer after defendant terminated her. The trial court's conclusion is supported by its finding that plaintiff immediately entered the job market and found comparable, albeit lower paying, work three days after defendant terminated her. Moreover, as the trial court found, plaintiff was nearly sixty-one years old when her Morgan's job ended. Being so close to retirement, it is highly unlikely that another employer would have taken a chance on hiring and training her for work comparable to what she was doing for defendant. In this light, her decision to become self-employed was reasonable. Again, plaintiff was able to secure a client for her home

typing business within a matter of days after her employment at Morgan's ended. It appears that plaintiff acted with the utmost good faith in trying to keep herself employed after defendant terminated her, and that was all that was required of her. See *id.* at 594, 795 A.2d at 1169.

¶ 38. Assuming, arguendo, that we agreed with defendant's contention that plaintiff could have been more diligent in finding work, defendant has failed to carry its burden of demonstrating that plaintiff's diligence would have been rewarded with a substantially equivalent position available to a person of plaintiff's age and with her experience. Defendant has not called our attention to, nor does the record reflect, any evidence that defendant introduced at trial regarding the job market in plaintiff's area at the time she allegedly failed to mitigate. See *id.* at 593-94, 795 A.2d 1168-69. Accordingly, the trial court's conclusion on mitigation must be affirmed.

¶ 39. Defendant further contends that the trial court erred by not deducting money that plaintiff earned working at home for OT/Therapeutic Dimensions from her final damage award. "'The measure of damages for wrongful termination of an employment contract is the amount that the plaintiff would have earned absent the breach, less what [plaintiff] actually earned or could have earned by the exercise of reasonable diligence during the contract period after [plaintiff's] termination.'" *Benoir v. Ethan Allen, Inc.,* 147 Vt. 268, 272, 514 A.2d 716, 719 (1986) (citation omitted). As noted, plaintiff had been working for Therapeutic since 1990 and continued to do so up until the time of trial. Her income from Therapeutic did not rise dramatically after her termination. When plaintiff worked for both defendant and Therapeutic, she worked between fifty-five and sixty hours per week with only forty hours of that work attributable to defendant. The trial court found that after she became self-employed she worked only forty hours a week — the same amount she worked for defendant. She testified that, at this point, she has all the work she can handle. Thus, when plaintiff worked for defendant, and then for Morgan's, the income from Therapeutic was mainly supplemental income. After leaving Morgan's, Therapeutic became one of two primary sources of income. This change in character must be reflected in the calculation of damages. From defendant's perspective, defendant should not be responsible for compensating plaintiff for what appears to be a voluntary choice to work less total hours now than she did when she worked for defendant. Although the amount of income from Therapeutic did not change, its role in plaintiff's overall income picture did. By excluding the Therapeutic income from the damages picture, the

trial court unfairly placed the burden on defendant to make up for the shortfall in plaintiff's income that resulted more from her voluntary choice to work fewer hours than defendant's decision to fire plaintiff. Accordingly, the trial court shall treat income from Therapeutic in the same manner it treats income from Quest for the period after her termination from Morgan's.

## C. Vacation Time

¶ 40. Defendant also challenges the trial court's decision to augment plaintiff's base pay damages by including additional funds to compensate plaintiff for paid vacation time. Plaintiff would have been contractually entitled to two weeks of paid vacation for the years 1998 through 2000, and to three weeks of paid vacation time for the years 2001 through 2004. Thus in calculating the net damages for those years, the trial court multiplied the number of vacation hours plaintiff could have taken by her hourly wage and added that number to each year's total damages. This resulted in her damages being increased by $860 for each of the first three damage years and $1,290 for each of the last four damage years. As the trial court noted, plaintiff did not receive the benefit of paid vacation time in her current employment.

¶ 41. Defendant argues that plaintiff is essentially receiving a double benefit for this vacation because the trial court's base pay calculation compensates plaintiff for fifty-two weeks worth of salary. In defendant's view, those fifty-two weeks already incorporate paid vacation, six paid holidays and five paid sick days. Accordingly, plaintiff is made whole by the fact that if she had worked for defendant she would have been paid for fifty-two weeks even though she would not have been required to work those fifty-two weeks.

¶ 42. We cannot say that the trial court erred in giving plaintiff some additional monetary benefit for vacation time that her subsequent jobs did not afford her. Nonetheless, the trial court's decision to provide plaintiff full credit for all the vacation she would have been entitled to without any findings on plaintiff's past behavior as it relates to vacation time was error. The conclusion on this issue is not reasonably supported by the findings and thus this portion of the damages award is remanded for further findings and such recalculation of damages that may be warranted by the findings.

## D. Bonuses and Raises

¶ 43. In calculating base pay damages, the trial court included $700 to account for one anticipated bonus, but did not include any amount for anticipated raises. Defendant contends that the court erred by including the anticipated bonus because defendant was not contractually bound to pay plaintiff bonuses. Plaintiff also claims error in the trial court's failure to account for anticipated future raises. The trial court's findings show that plaintiff received a raise of $.25 per hour in 1995 and another raise of $.50 per hour in 1996. The findings also indicate that plaintiff received bi-annual bonuses since becoming a full-time employee in 1994. The only exception being that she did not receive her December bonus of $700 in 1997 because she was terminated in November. The trial court also found that "[d]efendant has apparently continued its practice of awarding pay raises and bonuses since Plaintiff was terminated." These findings are supported by Morrissey's own testimony. With regard to bonuses, Morrissey testified that defendant "like[s] to give away money, and we do it if we can, and yes, we have succeeded almost every August and December." On the topic of annual raises, Morrissey testified that some employees got annual raises and some people did not. He testified that both bonuses and raises were "heavily merit related," although he did concede that during the five year period from plaintiff's termination in 1997 to the trial in 2002, customer service representatives did receive annual pay raises. By Morrissey's own testimony, the business has doubled in size since 1997.

¶ 44. Based on those findings, we cannot conclude that the trial court's decision to include a reasonably anticipated bonus was too speculative. The decision was based on undisputed evidence about plaintiff's prior employment history and the company practices and finances in the period after termination. See *Benoir*, 147 Vt. at 273, 514 A.2d at 719 ("[e]vidence of plaintiff's past employment history, coupled with proof of the company's operating history during the post-discharge period" provides fact-finder with a conservative estimate of employee's damages). Though plaintiff was not contractually entitled to bonuses it appears certain that she would have continued to receive bonuses as she had regularly in the past, and thus the trial court was within its discretion to provide plaintiff the bonuses.

¶ 45. The issue of annual raises presents a more difficult question. Unlike bonuses, which plaintiff received every year since becoming a full-time employee, plaintiff did not receive raises every

year. Specifically, plaintiff did not receive a raise in either her first, or her last year of full-time employment with defendant. We can see why the trial court felt that automatically granting plaintiff an annual raise was more speculative than granting annual bonuses. The issue of timing is especially difficult. The evidence shows that bonuses were granted every August and December. By contrast, plaintiff has not called our attention to any evidence that would assist the trial court in determining at what point in the year raises should be granted. This information is key because, unlike bonuses that can be expressed in consistent lump sums, raises affect the rate of pay that is in turn multiplied by the number of hours worked. Thus, a raise granted in January is far more valuable than a raise granted in November because it applies to a greater number of hours worked. Timing is not the only problem. While Morrissey's testimony does indicate that both bonuses and raises were "heavily merit based," the evidence shows that plaintiff did receive bonuses in 1994 and 1997, but did not receive raises in those years. Thus, the evidence suggests that the employer's standard for granting bonuses was more liberal than its standard for granting raises. Plaintiff's track record indicates that while she always met the standard for bonuses, for whatever reason, she did not always receive a raise. The trial court's conclusion that granting plaintiff annual raises would have been too speculative is reasonably supported by the findings and the evidence.

## E. Other Claims

¶ 46. Plaintiff appeals the trial court's use of anticipated gross income figures to calculate her income from Quest for the purposes of deducting this amount from her base damages as mitigation. She claims this was error because, according to expert testimony offered at trial, the correct way to calculate a self-employed worker's earnings is to deduct expenses from gross wages. As plaintiff's counsel concedes, the trial court's damage calculations with respect to her income from this source was based on plaintiff's own exhibit. Plaintiff cannot blame the court for an error that is of her own creation, especially when defendant relied on plaintiff's calculation at trial. As defendant points out, defendant did not cross-examine plaintiff on the issue of her expenses related to self-employment. If the court were to recalculate plaintiff's income by the formula she suggests, it would be on the basis of unimpeached testimony regarding her expenses. The trial court did not abuse its discretion by relying on plaintiff's own calculation.

¶ 47. Defendant claims error in the trial court's decision not to include income plaintiff receives as compensation for working for her husband's business approximately five hours per week at a rate of $10.00 per hour. Plaintiff testified that this amounted to a gross income of about $2,600 per year since 2001. Plaintiff testified that she reports this income on her taxes. Despite this testimony, the trial court failed to discuss this amount in its opinion. Therefore, on remand, the trial court shall consider the appropriate treatment of this income, and if necessary, adjust the damage award in light of its eventual conclusion with respect to this income.

*The trial court's judgment with respect to defendant's liability is affirmed. The trial court's damages award is affirmed in part and reversed in part, and the matter is remanded for further findings and a reconsideration and recalculation of damages consistent with the views expressed herein.*