2013 VT 102

## Michelle M. Straw v. Visiting Nurse Association and Hospice of VT/NH

[86 A.3d 1016]

No. 12-149

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed October 18, 2013

*Norman E. Watts* and *Stefan Ricci* of *Watts Law Firm, PC,* Woodstock, for Plaintiff-Appellant.

*Edward M. Kaplan* and *Sarah S. Murdough* of *Sulloway & Hollis, P.L.L.C.*, Concord, New Hampshire, for Defendant-Appellee.

¶ 1. **Dooley, J.** Plaintiff Michelle Straw appeals the judgment order of the superior court, pursuant to a jury verdict, dismissing her case for breach of an implied employment contract against defendant Visiting Nurse Association and Hospice of Vermont and New Hampshire (VNA). She argues that the jury instructions in her case were erroneous and prejudicial because they failed to instruct on the standard for "just cause" termination. We affirm.

¶ 2. Plaintiff is a licensed Advanced Registered Nurse Practitioner who worked for a number of years as a hospice triage coordinator for VNA, answering patient and family calls to VNA's telephone hotline. During her years of employment, she generally received favorable performance evaluations.

¶ 3. Plaintiff was hired as an at-will employee, and the VNA employee handbook states in many instances that employment with the organization is "at will." Despite those assertions, the handbook also contains a corrective-action disciplinary policy — though the language goes to great lengths to emphasize that it is not mandatory. The handbook introduces this policy by saying: "When, on occasion, an employee's performance or conduct standards are not acceptable, the [VNA] strives to preserve acceptable standards of conduct and job performance through constructive criticism and/or corrective action." The "common course of constructive criticism/corrective action" begins with a verbal discussion between a supervisor and an employee and continues through a written warning, a suspension, and termination. According to VNA management, immediate termination is limited to severe misconduct that "impacts patient care and safety."

¶ 4. In 2009, VNA received a complaint from the family member of a patient claiming that plaintiff had been rude and unprofessional to her. The result of the conversation with plaintiff was that the patient was transported to a hospital, where he died, despite his expressed wish to die in his home. Plaintiff's supervisor conducted an investigation, which included speaking with the family member of the patient and consulting with plaintiff to see what she remembered about the incident. Plaintiff sent an email with her recollection of the case based on her log and progress notes. After consulting with the family member of the patient, but

without speaking with plaintiff, VNA's president decided to terminate plaintiff's employment without engaging in any of the steps of constructive criticism and/or corrective action described in the employee handbook.

¶ 5. Plaintiff disputes the family member's characterization of the event entirely. While she recognizes that the behavior detailed in the complaint, if true, would be unprofessional and could be grounds for termination, she denies any inappropriate behavior whatsoever. At the time that she made the decision to terminate plaintiff, VNA's president was not aware that plaintiff denied having acted in the way reported by the family member.

¶ 6. After being terminated, plaintiff brought suit against VNA for violation of the Vermont Fair Employment Practices Act and for wrongful termination, the latter claim being based on separate counts of promissory estoppel and breach of an implied employment contract that had been created by the dissemination of the employee handbook.[1] Summary judgment was granted to VNA on the age discrimination and the promissory estoppel claims, but the implied-employment-contract claim went to a jury trial.[2]

¶ 7. Plaintiff prepared proposed jury instructions and a proposed jury verdict form. The proposed instructions included a section on just cause for termination, indicating that the jury had to find whether plaintiff committed the acts the complainant alleged, and if she did, whether her conduct "constituted just cause warranting her termination." The instruction went on to say that just cause required a determination that "it is reasonable to discharge an employee because of the alleged conduct" and that

---

[1] Plaintiff's breach-of-implied-contract claim was based entirely on VNA's alleged failure to use progressive discipline. Plaintiff never claimed that she was terminated without just cause.

[2] In the summary judgment decision, the trial court addressed the grounds for plaintiff's termination, noting that the record evidence suggested that defendant "drew some sort of line between the types of unprofessional conduct that warranted immediate termination and the types that did not" and concluded "[i]t will be the jury's role to determine exactly where this line was drawn, whether the employees had reason to rely upon the line, and, as discussed below, whether plaintiff's conduct fell outside the line or not." It went on to say that "the final question is whether plaintiff's conduct was sufficiently serious to warrant termination" and that there were "disputed facts as to whether this particular incident was serious enough [to] warrant immediate termination." It noted an "apparent concession that the issues can be resolved on the basis of the employer's findings and the depth of its investigation rather than by further inquiry into the complainant's experiences on the day her husband died."

plaintiff had "fair notice" that the conduct would be grounds for discharge. Plaintiff's proposed jury verdict questions asked first whether an implied employment contract existed "concerning the terms of [plaintiff's] employment?" If the answer to this question was yes, it asked whether "defendant had just cause to terminate plaintiff[.]" The questions contained no other liability standard.

¶ 8. There were two conferences on the jury instructions. Prior to the first, the court had prepared a draft that included reference to a just cause standard for termination. This conference was primarily a discussion that went on for about an hour. To the extent there were formal objections, they came from defense counsel. Defense counsel specifically objected to use of a just cause standard to determine whether the termination was lawful.

¶ 9. The second conference was conducted during the morning before the closing arguments and the charge to the jury. The court prepared a new draft that dropped any reference to just cause, instead referring more generally to whether the employer had breached the implied contract. Plaintiff's counsel specifically objected to the deletion of the just cause standard, arguing that the cases from this Court hold that once the jury finds a modification, they "then decide whether or not there was just cause." Plaintiff's counsel summarized: "So we object on the basis of the court's continuing interpretation" of the Vermont Supreme Court cases. The court made no change in the instruction in response to this objection.

¶ 10. Following the jury charge, the court asked whether there were any objections. Plaintiff's counsel answered "I just reiterate the previous objections that I expressed." The court further inquired, "About the just cause?" and plaintiff's counsel answered, "Yes." The bench conference then went on to defendant's objections.

¶ 11. The court gave a special verdict form to the jury. The first question on the form was:

> Has plaintiff . . . proven by a preponderance of the evidence that her at-will employment status was modified by defendant VNA's employment handbook or by its policies and practices?

The second question was:

> Has plaintiff . . . proven by a preponderance of the evidence that defendant VNA obligated itself to follow

certain disciplinary procedures, and that the VNA failed to follow those procedures in this case?

The jury answered "yes" to the first question and "no" to the second, so they did not proceed on to the third question, which asked them to compute back pay if they found that the employment contract had been breached. Pursuant to the jury finding, judgment was entered for defendant.

¶ 12. On appeal, plaintiff makes one central argument: that the jury instructions were erroneous and prejudicial because they included no instruction on "just cause." The crux of her argument is that "[o]nce the employer modifies the 'at-will' employment relationship it is bound to terminate only for cause." Consequently, because plaintiff believes that there is no difference between "just cause" and "cause," and because this Court has previously defined "just cause," plaintiff argues that the instructions were erroneous and "prevented the jury from evaluating the dismissal according to a commonly recognized standard." Furthermore, she asserts that the exclusion of a "just cause" instruction from the jury instructions was prejudicial because it did not allow the jury to evaluate either (1) whether plaintiff engaged in the alleged conduct; or (2) whether the conduct was enough to merit termination under the Court's "just cause" standard as opposed to misconduct that impacts "patient care and safety" under VNA's standards.

¶ 13. ■ ■ Before we examine the substance of plaintiff's claims, we look at the preservation of the issue. V.R.C.P. 51(b) requires that to preserve an objection to a jury instruction, a party must object "thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Plaintiff's brief post-instruction objection — that plaintiff's counsel repeated his earlier objections — does not meet this standard. As we held in *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 138, 636 A.2d 744, 750 (1993), "we do not believe that a blanket reference made after the charge to arguments made before the charge, even if allowed by the trial court, complies with Civil Rule 51(b)." See also *Weaver v. Brush*, 166 Vt. 98, 106, 689 A.2d 439, 445 (1996) (same). Nor does it state "distinctly" the matter objected to or "state the grounds of the objection." See *Winey*, 161 Vt. at 138, 636 A.2d at 750; see also *State v. Vuley*, 2013 VT 9, ¶ 38, 193 Vt. 622, 70 A.3d 940 (decided under identical

V.R.Cr.P. 30). The court's follow-up question — "About the just cause?" — added a little more specificity when answered affirmatively but did not at all specify the grounds for the objection.

¶ 14. Even if the post-instruction objection could be judged sufficient to comply with Rule 51(b), it refers back to a charge-conference objection that was only marginally more complete.[3] The charge-conference objection stated that the precedents require that once the jury finds a modification, the jury must go on to decide "whether or not there was just cause." With this very limited preservation, we are left only with the question of whether just cause, however defined, is required in every case where an employee is not an employee at will.[4]

¶ 15. Even if plaintiff had preserved an objection, we would affirm on the narrow issue presented. We will address this issue because we recognize from the arguments and the analysis of the trial judge that our decisions have created understandable confusion.

¶ 16. ■ The issue involves a fundamental disagreement about the nature of an implied contract of employment. Both parties acknowledge that an employee hired for an indefinite period of time is presumed to be an at-will employee, *Dulude v. Fletcher*

---

[3] We judge the charge-conference objection only marginally more complete because it says nothing about the definition or content of just cause. As we noted above, plaintiff filed proposed jury instructions that defined the elements of just cause but never referred to the filing in any of the discussions in the charge conferences and even used a definition contrary to that in the proposed instruction. In the charge conference, plaintiff's counsel argued that "the employer in this case defined just cause by saying unprofessional conduct and endangering patient care. That is just cause." In the proposed charge, plaintiff defined just cause in accordance with the elements set forth in *In re Brooks*, 135 Vt. 563, 382 A.2d 204 (1977). See *infra*, ¶ 17. As noted *infra*, n.5, this inconsistency in plaintiff's arguments has continued in her briefing.

[4] Plaintiff's brief to this Court covers more than this narrow question, but there is clearly no preservation of other issues. For example, plaintiff asserts that she wanted the jury to decide "whether appellant engaged in the misconduct alleged, and if she did, whether the alleged misconduct amounts to just cause." She alleges that these issues were raised in the pleadings and were omitted from the special interrogatory. In fact, there is no mention of these questions in plaintiff's complaint, and the special interrogatories she proposed did not include them. We can find no instance where plaintiff sought that these questions be in the charge or the special interrogatories. This is so even in the first charge conference, where plaintiff had no objection to the court's original charge — which did not address these questions.

*Allen Health Care, Inc.*, 174 Vt. 74, 80, 807 A.2d 390, 395 (2002), and that this presumption can be overcome by evidence that the employer unilaterally modified the at-will status by adopting policies and practices — through an employee handbook or other means — that are inconsistent with at-will employment, *Taylor v. National Life Insurance Co.*, 161 Vt. 457, 464, 652 A.2d 466, 471 (1993). However, the parties disagree as to the terms of that implied contract.

¶ 17. Plaintiff's theory is that once the at-will status of an employee has been modified by an implied contract, a switch is flipped as to the proper grounds of termination for that employee, and termination is henceforth subject to a "just cause" require-ment. In her brief, plaintiff describes just cause as "a public policy standard" and a "commonly recognized standard." To the extent that plaintiff advanced a standard for determining just cause,[5] it is stated in plaintiff's requests to charge and is a standard adopted by this Court for determining the validity of public employee firing in *In re Brooks*, 135 Vt. 563, 568, 382 A.2d 204, 207-08 (1977). The *Brooks* standard does not include any terms of the particular (implied) contract.

¶ 18. Defendant, on the other hand, argues that situations under which someone can be terminated are defined by the implied contract rather than by an external "just cause" standard. There-fore, defendant asserts, there was no need for any instruction on cause in this case because the analysis of cause as defined under the contract was subsumed into the jury instruction about the breach of the employment contract.

¶ 19. ▮▮▮ Although there are many confusing elements to the doctrine of implied employment contracts (and we can guarantee that this will not be the last case centered on the terms of such a contract), one thing is clear: defendant is correct that simply

---

[5] As noted *supra*, n.3, plaintiff's counsel did suggest that just cause might be defined in terms of the self-imposed standards that defendant's management employees actually employed in individual cases. Thus, in the brief plaintiff describes the standard as "good and sufficient cause impacting patient care or safety," "severe misconduct," and "[u]nprofessional conduct," while at the same time proffering a "public policy standard" unrelated to the facts of a specific case. We have discussed particularly the public policy standard in the text because that is the one contained in plaintiff's proposed verdict form and proffered first in the charge conference. In fact, it is impossible to determine what standard plaintiff proposes.

modifying an employee's at-will status does not, on its own, automatically import our previously defined "just cause" standard into the contract.

¶ 20. ■ The only general "just cause" standard or definition in our case law traces back to *Brooks*. That case was not about an implied employment contract, but instead involved the interpretation of the phrase "just cause" as it appeared in a collective bargaining agreement for state employees. *Id.* at 566, 382 A.2d at 206. Relying upon three public employee dismissal cases from other jurisdictions, we first defined just cause as "some substantial shortcoming detrimental to the employer's interests, which the law and a sound public opinion recognize as a good cause for his dismissal," and then went on to state that "[t]he ultimate criterion of just cause is whether the employer acted reasonably in discharging the employee because of misconduct." *Id.* at 568, 382 A.2d at 207 (citations omitted). Finally, we held that a discharge under this standard could be upheld "only if it meets two criteria of reasonableness: one that it is reasonable to discharge employees because of certain conduct, and the other, that the employee had fair notice, express or fairly implied, that such conduct would be ground for discharge." *Id.* at 568, 382 A.2d at 208.

¶ 21. In the years since the *Brooks* decision, we have applied this test many times to cases involving the termination of state employees. See, e.g., *In re Jewett*, 2009 VT 67, 186 Vt. 160, 978 A.2d 470 (involving termination of correctional officer subject to collective bargaining agreement); *In re Hurlburt*, 2003 VT 2, 175 Vt. 40, 820 A.2d 186 (involving termination of supervisory employee of Department of Buildings and General Services); *In re Towle*, 164 Vt. 145, 665 A.2d 55 (1995) (involving termination of employee of Department of Corrections).

¶ 22. Confusingly, we have also applied this test a number of times to cases involving implied employment contracts. In the cases where we did this, however, we never held that any implied employment contract necessarily included a term for "just cause" as defined in *Brooks*. Instead, we assumed for purposes of argument that such a term was part of the contract and demonstrated that the terminations in those cases did meet the standard of "just cause." See *Dulude*, 174 Vt. at 80, 807 A.2d 395-96 ("Even if we assume . . . that a just cause term of employment was implied from the [employer] handbook or employment policy, we

conclude . . . that [the reasons for termination] amounted to just cause . . . ."); *Nadeau v. Imtec, Inc.*, 164 Vt. 471, 475, 670 A.2d 841, 844 (1995) ("Because we hold that defendants had just cause as a matter of law for plaintiff's discharge, we do not resolve the conflict about the applicable standard."). In her brief, plaintiff argues that we should use the definition for just cause from *Dulude*, which is the same as the reasonableness requirement in *Brooks*. *Dulude*, 174 Vt. at 80, 807 A.2d 395-96 (citing *Brooks*, 135 Vt. at 568, 382 A.2d at 207).

¶ 23. ██ We decline to do so. Under plaintiff's view of the doctrine of implied employment contracts, we could easily find ourselves in a situation where we would have to: (1) begin with a presumption of at-will employment; (2) find that presumption to be defeated by policies inconsistent with at-will employment, such as a particular set of standards governing when termination is permissible; and therefore (3) subject the employer to an entirely different, external standard — namely, the *Brooks* "just cause" standard. It is clear from *Taylor*, 161 Vt. at 464, 652 A.2d at 471, our first comprehensive decision on wrongful termination in private employment, that we adopted a contractual rationale for holding that employers — by their employment polices and actions — could assume obligations inconsistent with an employment-at-will relationship with their employees. Although we used the words "good cause" or "cause" in that decision, see *id.* at 464-65, 652 A.2d at 471, the point was to distinguish the employer's right to terminate for no cause in an employment-at-will relationship. What obligations employers assume have to be based on their policies and actions. As we said in *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 20, 665 A.2d 580, 584 (1995), "definitive policies, which expressly or impliedly include a promise for specific treatment in specific situations, especially when the employer expects the employee to abide by the same, may be enforceable in contract." It would be inconsistent with the contractual theory of liability, as well as simply illogical, to adopt plaintiff's view. It would also be unfair to the employer, who would effectively be unable to set up any standards for termination other than the "just cause" standard.

¶ 24. ██ ██ The Supreme Court of Utah faced a similar argument in *Sanderson v. First Security Leasing Co.*, 844 P.2d 303 (Utah 1992). In that case, the plaintiff claimed that a specific

promise had been made to him that he would not be terminated from his job because of illness, and therefore argued that his at-will employment status had been modified and he could be terminated only for cause. The court rejected that logic, stating:

> Even if his statements are interpreted in the light most favorable to [the plaintiff], [the employer] did not promise that he would fire [the plaintiff] only for cause or only for good cause. He promised merely that he would not fire [the plaintiff] for being unable to work because of his current illness. He retained his at-will prerogative to fire [the plaintiff] for any *other* reason.

*Id.* at 307. The general principle, the Utah court held, is that "[a]t-will employment is a bundle of different privileges, any or all of which an employer can surrender through an oral agreement." *Id.* We agree, and have adopted similar reasoning in the past. See *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 310-11, 683 A.2d 386, 389-90 (1996) ("[E]ven if the handbook modified plaintiffs' at-will status with respect to unsatisfactory performance by creating a disciplinary procedure, an issue we do not decide, plaintiffs could still be fired for reasons other than poor performance."). Following this logic, if an employer chooses to give its employees a measure of job security — in return for the higher morale of a secure workforce — by setting up standards governing grounds for termination, we will not interfere with that choice by imposing an arbitrary, separate standard for termination. We hold, therefore, that plaintiff was not entitled to an instruction on just cause as she requested.

¶ 25. In reaching this conclusion, we acknowledge that we have created confusion with our sloppy word choice in past decisions, jumping between "cause," "good cause," and "just cause," to the chagrin of litigants and judges alike.[6] See *Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 271, 514 A.2d 716, 718 (1986) ("[T]he . . . contract provision cannot be construed as being consistent with an at-will employment relationship. In short, the handbook, by clear implication, foreclosed defendant's right to terminate *without cause.*" (emphasis added)); *Dulude*, 174 Vt. at 80, 807 A.2d at 395

---

[6] We recognize this legitimate confusion in the words of the trial court in this case, which remarked during the charge conference: "So it's interesting why in June [*Dulude*] they talk about just cause, and in December [*Dillon*] they just talk about cause. 'They,' being the Supreme Court."

("[Plaintiff] can overcome this [at-will] presumption by presenting evidence that [her employer] unilaterally modified her at-will status with an express or implied contract of employment that provided for termination only for *cause*. Even if we assume, however, that a *just cause* term of employment was implied . . . ." (emphases added)); *Dillon v. Champion Jogbra, Inc.*, 175 Vt. 1, 5, 819 A.2d 703, 707 (2002) ("An employer . . . may implicitly bind itself to terminating only for *cause* . . . ." (emphasis added)); *Taylor*, 161 Vt. at 464, 652 A.2d at 471 ("We join the many courts that have held that personnel manual provisions inconsistent with an at-will relationship may be used as evidence that the contract of employment requires *good cause* for termination . . . ." (emphasis added)).

¶ 26. The most that can be said about our use of these terms is that there is no meaningful difference between "good cause," "just cause," and merely "cause." Cf. *Bishop v. Avis Budget Group, Inc.*, No. C 13-00566 SBA, 2013 WL 2081614, at *3 n.2 (N.D. Cal. May 14, 2013) ("The terms 'just cause' and 'good cause' are generally considered to be interchangeable."). We take this opportunity to clarify that the three terms are synonymous, with one exception: the *Brooks* "just cause" standard has been assigned a particular legal significance in the state-employee-collective-bargaining context, as discussed above. "Just cause" in any other context is no different from "cause" or "good cause," and we emphasize that all three terms could be better described in the implied-employment-contract context as cause as defined in the contract.

¶ 27. Finally, we stress that we are addressing a narrow issue. Plaintiff failed to object to any of the language of the charge delivered by the trial court, instead arguing that the charge should have contained additional language. Thus, we do not reach any claims that the substance of the charge contained reversible error.

*Affirmed.*

¶ 28. **Robinson, J.,** concurring in part, dissenting in part. I concur with the majority's thoughtful opinion concerning the merits of this case. I write separately to express my concern that the majority's discussion of the preservation issue in this case is unmoored from the purposes of the rules of civil procedure and

the practical realities of trials, and undermines the fairness and judicial efficiency those rules seek to promote.

¶ 29. The majority's opinion here — that plaintiff's objection to the court's failure to instruct as to "just cause" was insufficient to preserve her claim despite the lengthy back and forth between the parties and the court at the charge conference shortly before the instructions, and despite her articulation of her objections at that time — follows a recent and worrisome trend. In *State v. Vuley*, this Court held that a party's post-charge objection to the trial court's instruction on the so-called "doctrine of chances" was insufficient to preserve a defendant's objection to the instruction because defense counsel failed to reiterate the various bases for the objection post-charge — even though shortly before, at the charge conference, the court and counsel had engaged in a lengthy exchange during which defendant explicated the bases for the objection multiple times. 2013 VT 9, ¶¶ 36-39, 193 Vt. 622, 70 A.3d 940. I will not reiterate my lengthy review of our prior cases concerning the preservation requirements of V.R.C.P. 51(b) and V.R.Cr.P. 30. See *id.* ¶¶ 55-63 (Robinson, J., dissenting). Suffice it to say that I believe that the Court's opinion in *Vuley* went much further than any prior case in precluding review of an objection to a jury instruction on the basis of nonpreservation. Although the majority's analysis in this case relies upon V.R.C.P. 51(b), as opposed to V.R.Cr.P. 30, the underlying issue is the same: How detailed must a post-charge objection to an instruction be in order to preserve that objection? The majority's analysis here suffers from the same flaws as in *Vuley*.

¶ 30. The majority essentially holds that if a party does not reiterate the specific basis or bases for the objection post-charge, the objection, or the basis or bases of the argument, are not preserved — without regard to what has come before. The allure of this approach is that it follows a relatively bright line. It also makes our job as appellate reviewers easier insofar as we need only look to one place in a transcript to learn all we need to know about the preserved objections to jury instructions. But the downsides to this construction of V.R.C.P. 51(b) are that it does not conform to prevailing practices, potentially gums up the works at an already hectic stage of a trial, and unjustly precludes appellate review of arguments that were clearly articulated below, and understood and carefully rejected by the trial judge.

¶ 31. This last point is critical, as we have recognized that the purpose of the post-charge objection requirement is to give the

trial court "one last opportunity to avoid an error." *Id.* ¶ 59; see also *State v. Wheelock*, 158 Vt. 302, 306, 609 A.2d 972, 975 (1992). In this case, the trial court well understood the substance of plaintiff's objection, and its statements reflect thoughtful consideration and rejection of plaintiff's argument. When the trial court, after initially proposing to instruct on "just cause," indicated its intention to eliminate such an instruction, plaintiff promptly objected. Plaintiff argued that the proposed instruction ran afoul of a whole line of cases that, in plaintiff's view, support the notion that once a jury concludes that an employer has modified an at-will arrangement, the employer can only terminate for "just cause." Plaintiff cited several cases in the context of that discussion. The trial court explained why it rejected plaintiff's view, and the parties and the trial court engaged in an extended exchange of views on the subject, accounting for several trial transcript pages. The trial court maintained its position and ultimately delivered the instruction essentially as proposed and discussed in the charge conference. Less than an hour and a half after the charge conference, plaintiff reiterated her previous objections concerning "just cause." In this context, the post-charge objection was sufficient to put the court on notice that plaintiff *still* objected to the failure to include a "just cause" instruction, and of the basis for the plaintiff's objection. The court had ample opportunity to change course. Plaintiff complied with the preservation requirement of V.R.C.P. 51(b) with respect to the central argument urged on appeal.

¶ 32. I note that this is not a case in which a party made only a generalized or cryptic post-charge objection that failed to make her position clear to the court. See, e.g., *State v. Massey*, 169 Vt. 180, 188-89, 730 A.2d 623, 629 (1999). Nor is this a case in which plaintiff's arguments on appeal deviate substantially from the arguments set forth below. See, e.g., *State v. Covino*, 163 Vt. 378, 381, 658 A.2d 916, 918 (1994). If there was not preservation here, then I fear that careful litigants throughout the state, who believe they are being respectful of the court's and jury's time by refraining from rehashing extended statements of their objections and supporting arguments at a post-charge side bar — when the trial court has clearly heard, absorbed, and rejected those points already, the record reflects the arguments underlying the objections, and the jury is ready to begin deliberating — will find themselves denied appellate review of their objections on the basis

of an overly zealous application of V.R.C.P. 51(b) that does not promote the rule's underlying purposes.

¶ 33. For these reasons, I respectfully dissent from ¶¶ 13-14 of the majority's opinion.