2014 VT 15

# In re Grievance of John Aleong

[94 A.3d 1150]

No. 13-213

Present: Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.

Opinion Filed March 21, 2014

*Pietro J. Lynn, Robin A. Freeman, Jr.* and *Scarlett S. MacIlwaine* of *Lynn, Lynn & Blackman, P.C.*, Burlington, for Plaintiff-Appellant.

*Jeffrey J. Nolan* and *Sophie E. Zdatny* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Defendant-Appellee.

¶ 1. **Crawford, J.** Grievant appeals from a decision of the Vermont Labor Relations Board holding that his grievance of the termination of one portion of his teaching position at the University of Vermont falls outside the Board's jurisdiction. We affirm.

¶ 2. In 1994, the University's Department of Plant and Soil Science hired grievant as a tenured professor on a 0.8 full-time-equivalent (FTE) basis. The department forms part of the College of Agriculture and Life Sciences (CALS) within the University. At the same time, grievant received a supplemental salary for teaching one course per semester at the University's College of Engineering and Mathematical Sciences (CEMS). The appointment at CEMS was a 0.2 FTE position.

¶ 3. Together, grievant's two positions added up to full-time employment. Grievant's initial engagement letter sent to him in March 1994 addressed both teaching assignments. It identified the 0.8 FTE position at CALS as a tenured position. The 0.2 FTE position at CEMS was different. The letter stated that the supplemental position at CEMS "will be provided by that College as long as your teaching is deemed satisfactory by normal University standards." Since 1994, grievant has taught statistics and related courses at both CALS and CEMS on the 0.8/0.2 basis described in his engagement letter. He has also taught summer school and adult learning courses in addition to his full-time workload.

¶ 4. The University first sought to terminate grievant's 0.2 FTE position in March 2005 when the chair of the Department of Mathematics and Statistics within CEMS informed grievant that the 0.2 FTE position would be discontinued due to poor student evaluations, cancelling classes, tardiness in submitting grades, lack of availability outside class, and unresponsiveness to students and supervisors. United Academics, the faculty union, filed a grievance on grievant's behalf.

¶ 5. The grievance was settled in October 2005 before it could reach the Board. The parties signed a memorandum of understanding (2005 MOU) to memorialize their agreement that the University would continue to offer grievant the 0.2 FTE supplemental teaching assignment at CEMS "until a review has determined that his teaching is not satisfactory by normal University standards." The grievance was withdrawn. A review of grievant's teaching performance conducted in the spring semester of 2006 was favorable.

¶ 6. In January 2012, the quality of grievant's instruction became an issue for a second time. The director of the statistics program within CEMS, Professor Jeffrey Buzas, received student evaluations from four sections of the statistics class taught by grievant during the fall 2011 semester. Once again, the evaluations were poor. The students criticized grievant for a lack of organization and for failing to respond to students' questions. Students also complained that grievant kept trying to reschedule Friday classes despite student conflicts with the alternative times he proposed.

¶ 7. In response to these complaints, the deans of CEMS and CALS opened a joint investigation. It included a review of the student evaluations by two other professors and interviews of grievant and some of his students from the fall 2011 semester.

¶ 8. In April 2012, the two deans sent grievant a letter summarizing the results of their investigation. The letter was critical of grievant's teaching during the fall 2011 semester and of what the deans described as a deflection of personal responsibility and a lack of candor about the issue of holding class on Fridays.

¶ 9. Following the deans' letter, the director of statistics and the chair of the Department of Mathematics and Statistics sent a letter to grievant that terminated his 0.2 FTE teaching appointment at CEMS. In May 2012, the deans of CEMS and CALS also sent a letter of discipline to grievant reprimanding him for the shortcomings revealed by their investigation. The letter expressly imposed "the following discipline: you will be ineligible for assignments yielding supplemental or additional compensation until the end of the spring 2015 semester."

¶ 10. In response to the two letters, grievant wrote to the chair of the Department of Mathematics and Statistics at CEMS seeking review of the termination of the 0.2 FTE teaching appointment. He complained about the conduct of the investiga-

tion, the absence of "just cause" to support termination of the part-time position, procedural mistakes, and the "untimely basis" of the discipline. He sought reinstatement of the 0.2 FTE position. This letter initiated the grievance process.[1]

¶ 11. The grievance made its way through review by University administrators who uniformly denied the grievance. In August 2012, grievant filed his first grievance with the Vermont Labor Relations Board. In this grievance, he alleged that the May 2012 letter of discipline was not supported by "just cause"; was not expressly identified as a letter of reprimand; and was untimely administered, all in violation of the CBA between the University and the faculty union.

¶ 12. In September 2012, grievant filed a second, supplemental grievance. His second grievance claimed that the termination of the 0.2 FTE position was unsupported by just cause, was untimely administered, and violated termination procedures under the CBA, and that any shortcomings in teaching performance were due to the University's failure to provide "adequate professional resources." Finally, he claimed that the University failed to follow the terms of the parties' 2005 MOU regarding termination.

¶ 13. The Board conducted a consolidated grievance hearing over the course of two days in January and February 2013. In April 2013, it issued detailed findings of fact and conclusions of law. In the first grievance, the Board ruled in favor of grievant on most issues. This grievance concerned the discipline imposed with respect to the 0.8 FTE teaching position in CALS. The Board determined that although there was evidence that grievant "demonstrated poor to unsatisfactory overall teaching performance during the fall 2011 semester," the University failed to prove that grievant acted with sufficient intent to support its claims against him. The Board found that the evidence offered by the University to support the claim that grievant was untruthful in the course of the investigation was "mixed and too weak" to support the claim.

---

[1] In the years following the start of grievant's employment in 1994, the University entered into a series of collective bargaining agreements with United Academics, the union for full-time faculty members (with certain exceptions not relevant here). The collective bargaining agreement (CBA) applicable to this case covers the period from December 2011 to June 2014. Article 12 of the CBA describes the steps of the grievance process. These consist of three meetings with University supervisors and administrators of increasing seniority. The fourth and final step is the filing of a grievance with the Board.

The Board ordered the University to rescind the disciplinary action and award back pay and benefits lost by grievant. The Board denied grievant's claim that the University had failed to provide appropriate support to him as untimely. This decision was not appealed by either party.

¶ 14. In the second grievance, the Board reached a different conclusion. This grievance concerned only the April 2012 termination of grievant's 0.2 FTE teaching position within CEMS. The Board concluded that it lacked jurisdiction over the termination of the part-time position. It reasoned that the termination of the position was neither the discharge of a faculty member prior to the term of his employment nor the disciplinary termination of a tenured professor as these terms are defined in the CBA. The Board concluded that the termination of the 0.2 FTE position was "the end of a semester to semester assignment at the conclusion of a semester based on a determination that [grievant's] teaching was not satisfactory by normal teaching standards." It was not the "disciplinary termination" of a tenured professor because grievant lacked tenure for the 0.2 FTE appointment. Finally, the Board concluded that grievant's claim that the University had failed to follow procedures set out in the 2005 MOU lay beyond its jurisdiction because the MOU stands outside of the CBA as the settlement of a single dispute with no application to future actions by the University.

¶ 15. Grievant appeals from this decision. He renews his arguments that the termination of the 0.2 FTE position was "discipline" within the meaning of the CBA and that the 2005 MOU is a side-letter agreement between the union and the University which is subject to the provisions of the CBA. If correct, either of these claims would confer jurisdiction on the Board and give rise to a potential remedy for grievant under the CBA.

¶ 16. In interpreting the provisions of the CBA, we give "substantial deference" to the expertise of the Board in construing collective bargaining agreements. *In re Rosenberg*, 2010 VT 76, ¶ 12, 188 Vt. 598, 11 A.3d 651 (mem.). In reviewing the Board's decision, we evaluate "whether the evidence supports the Board's factual findings, and whether those findings, taken as a whole, justify the conclusions of law." *United Academics v. Univ. of Vt.*, 2005 VT 96, ¶ 9; 179 Vt. 60, 889 A.2d 722.

¶ 17. ■ This appeal raises a single issue: whether the Board was correct in its ruling that it lacked jurisdiction over the

University's termination of the 0.2 FTE position. The Board's jurisdiction is conferred by statute. Among its responsibilities is the duty to conduct hearings concerning grievances filed by state employees, including most University faculty members, or their unions. 3 V.S.A. §§ 902(5), 926(a). A grievance is defined as a dispute concerning "aspects of employment or working conditions under collective bargaining agreement or the discriminatory application of a rule or regulation." 3 V.S.A. § 902(14). Issues or disputes that fall outside of this definition are not subject to the jurisdiction of the Board.

¶ 18. Grievant makes two arguments in favor of the exercise of jurisdiction by the Board. The first is that termination of the position was "discipline" of a faculty member, which is specifically covered by the CBA. The second is that the position became subject to collective bargaining when the union and grievant signed the MOU that settled their prior dispute in 2005. We agree with the Board that the termination of the 0.2 FTE position was not an instance of faculty discipline. We also agree that the 2005 MOU is not subject to the terms of the CBA. For these reasons we affirm the decision of the Board.

## I. Whether Grievant Was Subjected to "Discipline" as Defined by the CBA

¶ 19. ■ We start with grievant's argument that termination of the 0.2 FTE position was "discipline" within the meaning of the CBA. Although grievant's employment with the University predates the CBA, his employment became subject to its terms upon ratification in 2003. See *United Academics*, 2005 VT 96, ¶ 11 (explaining that collective bargaining agreements supersede individual contracts in most cases). These terms include Article 13, which provides both the substantive basis and the procedural rules for faculty discipline proceedings.

¶ 20. The question of whether termination of the 0.2 FTE position should be treated as "discipline" is critical to the outcome of the case because Article 13.1 of the CBA provides that a faculty member cannot be "subject to discipline without just cause." The grounds for termination are limited to "dereliction of duties, professional incompetence, gross misconduct or academic dishonesty." The University's decision to terminate the 0.2 FTE position was based on a determination that "recent reviews of [grievant's] teaching have documented poor to unsatisfactory performance in

the classroom." Findings of this nature differ substantially from the standard required to support termination when imposed as a disciplinary measure. The jurisdiction of the Board depends upon whether the termination of the 0.2 FTE position qualifies as faculty discipline.

¶ 21. Article 13 of the CBA sets forth an exclusive and specific list of the forms of discipline which the University may impose on a faculty member. It provides that discipline shall be limited to letters of reprimand; ineligibility for sabbaticals and professional development funds; suspensions without pay of varying length; ineligibility for teaching evening school and summer school courses; and termination. Action by the University which qualifies as discipline triggers procedural protections for the faculty member, including the right to notice and a hearing, the right to counsel, the right to certain deadlines, and the sealing of any charges dismissed at a preliminary stage. The Board has jurisdiction through its review of the grievance process of any dispute concerning the substantive basis for discipline or the process through which it is applied. 3 V.S.A. § 926.

¶ 22. Grievant points to "termination" as the particular form of discipline to which he was subjected. Article 13 provides a two-part definition for termination as discipline: "As used in this Agreement, 'termination' shall refer to the discharge of a faculty member prior to the expiration of his or her appointment with the University or the discharge of a tenured faculty member." We apply this definition to the facts of the case to determine whether grievant suffered a disciplinary termination when the dean of CEMS ended his 0.2 FTE teaching assignment.

¶ 23. We first consider whether this was a discharge of a faculty member *prior* to the expiration of his appointment. There is no dispute, of course, that grievant is a faculty member for purposes of the CBA. It is the term or duration of his 0.2 FTE assignment which is in dispute. When grievant was originally hired, his employment letter stated that he would have the opportunity to teach these classes "as long as your teaching is deemed satisfactory by normal University standards." This language provided an open-ended contract limited in duration by the University's continued satisfaction with the quality of grievant's teaching.

¶ 24. ■ It is neither unusual nor unlawful for a contract of employment to continue without a fixed end-point. Many at-will

employment contracts take this form. See, e.g., *Straw v. Visiting Nurse Ass'n*, 2013 VT 102, ¶ 16, 195 Vt. 152, 86 A.3d 1016 (involving at-will employee hired for indefinite term); accord *Adams v. Green Mountain R.R.*, 2004 VT 75, ¶ 5, 177 Vt. 521, 862 A.2d 233 (mem.); *Havill v. Woodstock Soapstone Co.*, 2004 VT 73, ¶ 11, 177 Vt. 297, 865 A.2d 335. The indefinite duration of this portion of grievant's appointment was unaffected by ratification of the CBA in 2003.[2] At that time, the University recognized the faculty union as grievant's exclusive representative for purposes of collective bargaining. Grievant acquired additional protections as a union member, but the terms of his 1994 appointment letter under which he held a part-time position at CEMS were not altered by any provision of the CBA.

¶ 25. In 2005, the execution of the MOU between grievant and the University altered the term of the relationship by providing that the 0.2 FTE position would be reinstated "until a review has determined that [grievant's] teaching is not satisfactory by normal University standards." The duration of the part-time appointment remained indefinite, but the event which would trigger its termination by the University was specifically identified as an unsatisfactory review.

¶ 26. In construing the parties' relationship after the 2005 MOU, the Board determined that the contractual relationship had changed to "an assignment on a semester to semester basis which would continue contingent on [grievant's] teaching being satisfactory by normal University standards." This is a reasonable interpretation of the contract, especially because it is consistent with the original 1994 letter of employment which provided that the position was contingent on satisfactory teaching. As the Board pointed out, subjecting the 0.2 FTE position to the standard required for termination of a faculty member under the CBA "would be granting [g]rievant many more rights than set forth in the 1994 letter of appointment and the 2005 Memorandum of Understanding." Both the letter of appointment and the 2005 MOU conditioned the 0.2 FTE position on "satisfactory" teaching.

---

[2] As a general matter, the CBA excludes part-time faculty members from the collective bargaining unit. Article 1.2 of the CBA states that "those [faculty members] who are less than .75 FTE appointments for 9, 10, 11 or 12 months" are excluded. While this provision does not exclude grievant since he also held a tenured 0.8 FTE position, a faculty member hired only for the 0.2 FTE position would have very limited protections under the CBA.

Termination of a position under the provisions of the CBA, on the other hand, would require a showing of "dereliction of duties, professional incompetence, gross misconduct or academic dishonesty."

¶ 27. ■ In applying a deferential standard of review to the Board's interpretation, we limit our review to whether there are facts sufficient to support the conclusion that grievant held the 0.2 FTE position on a semester-to-semester basis. *United Academics*, 2005 VT 96, ¶ 9. The language of the 1994 letter and the 2005 MOU are not in dispute. Both demonstrate that employment is contingent on satisfactory teaching, and, after 2005, the assignment would continue until grievant received an unsatisfactory review. Once the term of the contract is limited by a future event, the occurrence of that event and the end of the contract cannot be considered premature for purposes of the CBA.

¶ 28. Grievant contends that the Board erred in selecting the semester instead of the full academic year as the governing interval for the duration of the appointment. We disagree. In this case, the problems with grievant's teaching performance arose in the fall 2011 semester and resulted in the termination of the part-time position at the end of the spring 2012 semester. This course of events is consistent with the original letter of appointment in 1994, which provides that grievant will receive a supplementary salary "for teaching one course each semester," and the 2005 MOU, which describes the appointment as "one course each semester." These agreements make no provision for a period of review of grievant's performance over two semesters.

¶ 29. ■ The Board correctly determined that its jurisdiction to review the termination of a nontenured position was limited to untimely terminations. The termination of grievant's 0.2 FTE position occurred at the end of the spring 2012 semester following the unsatisfactory review. It was precipitated by the unsatisfactory review and did not interrupt the term of the contract which had always been semester to semester, subject to satisfactory performance. We agree with the Board's determination that the termination of the part-time position at the end of the normal semester cycle falls outside the contractual definition of faculty discipline and is not subject to Article 13 of the CBA.

¶ 30. ■ The other definition of "termination" within Article 13 is the discharge of a tenured faculty member. The Board con-

cluded that grievant's tenured position was not terminated, and we agree. The 0.2 FTE position falls outside the scope of his 0.8 FTE tenured position. He prevailed in his grievance regarding the tenured portion of his employment. Grievant remains a tenured professor. The elimination of the nontenured portion of his contract hardly amounts to his "termination" for purposes of the CBA.

## II. Whether the 2005 MOU Was a "Side Letter" Subject to the Terms of the CBA

¶ 31. The parties disagree over whether the 2005 MOU is a "side letter" that is part of the CBA or the settlement of a dispute that lies outside the scope of the CBA. The issue is one of contractual intent: does the 2005 MOU provide evidence by its terms that the parties intended to incorporate it into the CBA? The Board answered this question in the negative, and we affirm.

¶ 32. ■■ We start by considering the relationship between the 2005 MOU and the CBA. In the context of collective bargaining, side letters include two types of agreements. First, it is common for management and a union to enter into side agreements which apply generally to all or to certain categories of employees. See, e.g., *Price v. Unite Here Local 25*, 883 F. Supp. 2d 146, 152 (D.D.C. 2012) (explaining that parties may enter into an enforceable side agreement that supplements original collective bargaining agreement). This is not that type of side letter.[3] Side letters that affect only one employee are more controversial. They violate the general rule that union members receive similar rights and benefits under the CBA and cannot be singled out for better or worse treatment. See *J.I. Case Co. v. NLRB*, 321 U.S. 332, 338 (1944) ("The practice and philosophy of collective bargaining looks with suspicion on such individual advantages."). A side agreement which conflicts with the CBA is unenforceable. As the *J.I. Case* decision recognizes, however, there are issues which arise in individual cases that may be resolved through a side agreement

---

[3] For example, the CBA contains a "side letter of understanding" related to assignments within the Department of Romance Languages. This is an example of a side letter between the union and the University. A violation of this type of side letter would in all likelihood give rise to Board jurisdiction.

with an individual employee. *Id.* at 338-39. So long as these do not violate the terms of the CBA, they are generally enforceable even though they create individual contract rights outside of the CBA. *Id.* at 339.

¶ 33. These principles were endorsed by this Court in *United Academics v. University of Vermont*, 2005 VT 96, ¶ 12. In that case, a visiting professor negotiated a special appointment prior to the ratification of the CBA. She later sought to extend the terms of the CBA to her unique circumstances. We characterized her appointment as a "special arrangement . . . that would not extend to typical employees under the agreement." *Id.* We ruled that such individual agreements could be enforced even though they differ from the terms of the CBA. See *id.* ¶ 11 ("[W]e have not yet precluded an individual employee from negotiating an individual contract that provides benefits above and beyond the terms of a collective bargaining agreement."). We held that the professor's special appointment, which preceded ratification of the CBA, "conferred upon her a special benefit [and therefore] the collective bargaining agreement did not affect the terms of her individual contract." *Id.* ¶¶ 11-12.

¶ 34. Prior to execution of the MOU in 2005, grievant benefitted from a unique appointment that preceded the establishment of collective bargaining agreements between the union and the University. Like the individual agreement recognized and enforced in *United Academics*, grievant's part-time position originated as a special arrangement neither contemplated nor governed by any version of the CBA.

¶ 35. Grievant contends that execution of the 2005 MOU changed the parties' contractual relationship by extending the terms of the CBA to his part-time position. He argues that because the MOU was executed by the union and the University, it must be considered to supplement the CBA. He notes that he did not sign the MOU himself and that there is no evidence in the record that he participated in the negotiation and settlement of his claim.

¶ 36. ■ ■ It is common for unions and management to sign letters of understanding or side agreements which are separate from the CBA. Whether they are viewed as supplemental to the CBA and subject to its terms or as independent agreements is a

decision which courts make on a case-by-case basis.[4] As the cases cited by both sides concerning the application of arbitration clauses to side agreements illustrate, the incorporation of the side agreement into the CBA is not automatic. It requires a determination of whether the side agreement is sufficiently close in subject matter to the CBA that it demonstrates the parties' intent to extend the provisions of the CBA to their additional agreement. We consider below whether the specific terms and circumstances of the MOU demonstrate such an intent. We reject, however, the more general argument that any side agreement between the union and the University must be subject to the CBA just because the CBA governs most issues between these parties.

¶ 37. As part of his argument, grievant claims that because he was not a signatory to the MOU, it cannot be considered to be the isolated resolution of a single claim. Grievant, however, does not seek to rescind the MOU on grounds that it was executed without his authority or subsequent ratification. Instead, he seeks to enforce it and to incorporate into it the substantive provisions of the CBA. His argument is that the union representative's signature on the MOU alone subjects it to the provisions of the CBA because the CBA is the master agreement between the union and the University.

¶ 38. ■■■ Whether the union representative signed the 2005 MOU does not resolve the question of whether the MOU is subject to the CBA. This issue depends upon the parties' intent as it is expressed in the MOU or as demonstrated by the parties' conduct. Whether the union acted solely as grievant's representative or had an independent interest in the outcome of the 2005

---

[4] This issue arises most frequently when one party seeks to apply an arbitration provision in a collective bargaining agreement to the enforcement of the side agreement. As the parties recognize in their briefs, there is a split of authority within the federal circuits on the appropriate test for cases arising under the Labor Management Relations Act of 1947. Some circuits look to whether the side agreement is "collateral" to the collective bargaining agreement, while others examine whether the arbitration clause is sufficiently broad in its "scope" to reach the side agreement. Compare *Cornell Univ. v. UAW Local 2300*, 942 F.2d 138, 140 (2d Cir. 1991) (applying collateral test), with *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 279 (6th Cir. 2007) (applying scope test). Regardless of the test adopted, these cases recognize that not all side agreements are subject to collective bargaining. Under either line of decisions, the courts must consider the specific terms of the side agreement and its relationship to the collective bargaining agreement.

dispute does not determine whether the CBA applies to the MOU. As the line of federal labor arbitration cases cited above demonstrates, there are circumstances in which a side agreement signed by the union on behalf of the entire membership will not be subject to the provisions of the collective bargaining agreement. The question turns instead on the terms of each side agreement and the circumstances under which it was executed.

¶ 39. We therefore consider whether the 2005 MOU or the CBA contain specific terms that would make the MOU an amendment or addendum to the CBA. The CBA itself contains a contrary provision. Article 27, entitled "Effect of Agreement," provides in part: "This constitutes the entire Agreement between the University and the Union, arrived at as a result of collective bargaining negotiations, except such amendments hereto as shall have been reduced to writing and signed by the parties."

¶ 40. ■■■ The MOU makes no reference to incorporation of the CBA. Nor does the MOU contain terms which purport to amend the CBA. It is limited by its own language to the "settlement of [a] grievance." It contains no language adopting the discipline procedure of the CBA as the process for determining whether grievant's teaching has failed to meet satisfactory standards. Instead, it refers back to the 1994 letter of engagement as the basis for this determination: "The University agrees to continue to offer [grievant] a 20% teaching appointment . . . until a review has determined that his teaching is not satisfactory by normal University standards (as provided for in the appointment letter signed by [grievant]· on July 21, 1994)." In the absence of any provision expressly incorporating the procedures of the CBA into the MOU, we agree with the Board that the MOU is separate from the CBA.

¶ 41. The Board found additional support for its jurisdictional decision in the provision in the MOU that "[t]his settlement is without prejudice or precedent for any future actions taken by the University." This language supports the University's position that the effect of the MOU is limited to the resolution of the particular grievance filed by grievant and the union. By its terms it has no application to future actions such as the University's 2012 termination of the 0.2 FTE position that is the subject of this appeal. This provision of the MOU is at odds with grievant's argument that the MOU incorporates the protections of the CBA into any subsequent termination of the part-time position.

¶ 42. Grievant argues that the University's actions are inconsistent with its position that the MOU is not subject to the CBA. He points to the reference by Professor Buzas, the director of statistics at CEMS, to the faculty evaluation provisions of the CBA in reviewing grievant's teaching performance and the participation by the University and the union in the negotiation which led to the MOU. Neither of these actions support grievant's position that the MOU is subject to the CBA.

¶ 43. ■■■ Professor Buzas was the first supervisor to respond to the adverse student evaluations in January 2012. In the course of his testimony before the Board, he was asked where he looked for guidance about how to review a fellow faculty member's performance. He identified the provisions of the CBA and the teaching standards adopted separately by the Department of Mathematics and Statistics. When pressed to agree that the CBA was the primary source of the process which he followed, he answered: "Well, this 0.2 appointment is unique in the University, so I don't know that there has been the exact process for . . . documenting that has been established. But I have used the . . . standard practice that we use for full professors to evaluate teaching." Faced with the responsibility of evaluating a colleague, Professor Buzas looked to all available sources of guidance. That these included the CBA and the detailed provisions for evaluation of faculty which appear at Article 14 is unsurprising. But as the professor indicated in his testimony, he knew that the 0.2 FTE position was unique. In the absence of specific direction about the evaluation process in the MOU, he relied on the process applicable to other faculty evaluations. The professor's use of the provisions of the CBA as a model or template for conducting his evaluation of grievant's performance is hardly evidence that the parties intended to incorporate the CBA into the MOU seven years earlier, when the MOU was signed.

¶ 44. Grievant also argues in a similar vein that the University's engagement in the grievance process and its negotiation of the MOU with the union in 2005 are evidence that the University recognized, at that time, that the MOU was subject to the provisions of the CBA. Article 12 of the CBA establishes a four-step grievance process culminating in the filing of the grievance with the Board. The first three steps are described as "meetings" and take place without the presence of counsel. Once the grievance is filed, neither side has any discretion about

whether to participate in the required steps. Neither side can obtain a formal ruling about the application of the CBA to the dispute or the jurisdiction of the Board until the fourth and final step. The parties settled the 2005 grievance during the initial steps — prior to any filing with the Board — and before any legal determination of whether the termination of the part-time position was subject to the CBA. The University's engagement in the early stages of the grievance process in 2005 and the voluntary settlement it reached in that year with grievant does not establish that either the CBA or the MOU governed the termination of the part-time position.

¶ 45. ██ No provision of the 2005 MOU affects the interests of other employees or of the union itself. The MOU documents the resolution of an individual employee's dispute. In the absence of a statement within the 2005 MOU incorporating the provisions of the CBA, we cannot agree that union representation of the employee demonstrates an intent by either side to subject the 2005 MOU to the terms and conditions of the CBA.

*Affirmed.*